643 So.2d 327 (1994)
WALNUT EQUIPMENT LEASING CO., INC., Plaintiff-Appellant,
v.
Clarence H. MORENO, et al., Defendant-Appellee.
No. 26004-CA.
Court of Appeal of Louisiana, Second Circuit.
September 21, 1994.
*328 Benjamin F. Marshall, IV, Monroe, for appellant.
Minard & Evans by Iley H. Evans, Columbia, for appellee.
Before MARVIN, HIGHTOWER, VICTORY and BROWN, JJ., and JONES, J. Pro Tem.
VICTORY, Judge.
Plaintiff, Walnut Equipment Leasing Company, appeals a trial court judgment rejecting its claims against defendants, Clarence and Glenda Moreno d/b/a P & M Texaco, for unpaid rent for the lease of a tire changer. We reverse and render.

FACTS
Sometime prior to November 30, 1989, Larry Brown, a salesman for Webb Equipment Company, Inc. ("Webb") of Shreveport, Louisiana, approached Clarence and Glenda Moreno, d/b/a P & M Texaco (the "Morenos"), regarding the sale of a tire changer for use in their automobile service station. After Brown unloaded the machine and demonstrated its capabilities and safety features, Mr. Moreno decided that it suited the station's needs and orally agreed to either lease the tire changer or purchase it for $2,600.00. After consulting two certified public accountants, Mr. Moreno opted to lease the machine for tax purposes.
The lease was arranged through Walnut Equipment Leasing Company, Inc. ("Walnut"), a Pennsylvania corporation. Brown presented a Walnut lease application to the Morenos, which described the exact tire *329 changer selected (Hofmann TC 12 SE, Serial Number 1971091), listed P & M Texaco's and Webb's addresses, and indicated that Brown was the Webb salesman responsible for the transaction. On November 30, 1989, Mr. Moreno, on behalf of "P & M Texaco Service," wrote a $312.00 check payable to Walnut, representing the first monthly rental payment and the last two monthly rental payments, as a security deposit.
Brown then presented a Walnut lease form to the Morenos, which was signed by both of them sometime during December, 1989, and was accepted by Walnut on January 4, 1990. According to the terms of the lease, the Morenos were to pay monthly rentals of $104.00 for 39 months. At the end of the lease, the Morenos were to have no ownership interest in the tire changer and no option to purchase the machine. Additionally, Paragraph II of the lease contained a warranty disclaimer, which provided that Walnut made no representations or warranties of any kind, express or implied, as to the condition of the equipment, its merchantability or its fitness. On January 4, 1990, Walnut issued a purchase order to Webb requesting purchase of the Hofmann TC 12 SE, tire changer, Serial Number 1971091, and requesting delivery to P & M Texaco.[1]
Mr. Moreno also signed a document entitled "Certificate of Acceptance and Satisfaction," whereby he acknowledged receipt of the tire changer, and stated that he read and understood the terms of the lease. The certificate further provided that the Morenos had selected both the equipment and the supplier from whom the tire changer was purchased, and that neither the supplier nor the salesman were Walnut agents. Additionally, the certificate stated that the Morenos understood that Walnut made no warranties, express or implied, as to the condition of the equipment, and that Walnut would not be liable to the Morenos for losses or damages caused by the equipment or its use. Finally, the certificate provided that if the equipment did not operate as represented by the supplier or if it was not satisfactory for any reason, the Morenos would assert their claims solely against the supplier, Webb, and would nevertheless pay Walnut all of the rent due under the lease.
Walnut followed up the transaction by telephoning Mr. Moreno on two different occasions to confirm that he was satisfied, and that he understood the terms of the lease and his obligations thereunder. The contents of both conversations were memorialized by Joan Demow, a Webb employee, through a written telephone memorandum. The first telephone call was placed on January 8, 1990. According to the memorandum, Mr. Moreno confirmed receipt of the tire changer and stated that he was satisfied. He also acknowledged that Walnut was not responsible for service, repairs or maintenance of the leased equipment.
On or about February 2, 1990, the tire changer "blew up" while a P & M Texaco employee was repairing a tire. The tire and rim being repaired were damaged, and the tire changer was rendered unusable. Mr. Moreno contacted Brown to advise of the malfunction, who later came out to the service station to inspect the tire changer. After inspecting the machine, Brown decided that it was necessary to take it to Webb, in Shreveport, for repair. A few days later, Brown telephoned Mr. Moreno to inform him that it would cost approximately $2,000.00 to repair the tire changer. Mr. Moreno objected to the high cost of the repairs, since a new machine could be purchased for $2,600.00.
The Morenos refused to pay for the repairs. They also discontinued making monthly rental payments to Walnut. After making several oral and written demands for payment, Walnut sued the Morenos in Pennsylvania, and on August 1, 1990, obtained a "default" judgment for $5,463.64, representing accelerated and back lease payments, late charges, collection fees and taxes. On December *330 27, 1990, Walnut filed an "Ex Parte Petition for Enforcement of Foreign Judgment," in Caldwell Parish, Louisiana, requesting that the court recognize the Pennsylvania judgment.
On January 31, 1991, the Morenos answered Walnut's petition to enforce the Pennsylvania judgment. Therein, they generally denied Walnut's allegations and specifically pled that the Pennsylvania court lacked personal jurisdiction over them. They also claimed that the tire changer was defective and that it was not suitable for the purposes for which it was intended. The Morenos also reconvened against Walnut and Webb, claiming that the tire changer should have been repaired pursuant to the warranty provisions affiliated with the purchase/lease. The Morenos prayed for dismissal of Walnut's claims, rescission of the lease, and attorney fees and costs.
On February 20, 1991, Walnut answered the Morenos' reconventional demand, denying the allegations contained therein and asserting that all warranties were waived in the lease. On March 22, 1991, Walnut amended and supplemented its "Ex Parte Petition for Enforcement of Foreign Judgment." Therein, Walnut realleged its original claims, and alternatively claimed that if the Louisiana court determined that the Pennsylvania court lacked personal jurisdiction over the Morenos, it should render judgment on the merits in favor of Walnut. The Morenos answered Walnut's amended petition on May 1, 1991, reasserting the allegations and reconventional demands set forth in their answer to the original petition.
At the trial, the court found that the Pennsylvania judgment was not enforceable, and the parties presented the case on its merits for decision by the Louisiana court. After considering the testimony and other evidence presented, the trial court ruled in favor of the Morenos, declaring the lease null and void and ordering Walnut to refund all previously made payments. The trial court concluded that:
... the lessor simply cannot be allowed to exact a waiver of the obligation of warranting fitness from vices and defects while retaining the right to collect rent for the entire thirty-nine (39) month term, even if equipment proves defective less than one (1) month after commencement of the lease.
Walnut appeals, asserting numerous assignments of error. For the reasons stated, we reverse and render.

DISCUSSION

CHOICE OF LAW
Preliminarily, Walnut contends that the trial court erred by not applying Pennsylvania substantive law in this case. We agree.
Paragraph XXIV of the lease provides, in pertinent part, that:
EXCEPT WITH REFERENCE TO THE PROVISIONS OF PARAGRAPH III, THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN ENTERED INTO IN THE STATE OF PENNSYLVANIA AND SHALL BE CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THAT STATE. (Caps in original).
Paragraph III contains the default provisions applicable to the lease.
Traditionally, Louisiana courts have found that parties to a contract may agree to have their contract controlled by the law of a state other than their own, provided the terms of the contract are not against the public policy of the state in which the contract is made and the state in which the contract is to be performed. Ogden v. Barby Joint Venture, 525 So.2d 1, 6 (La.App. 1st Cir.1987), on rehearing, citing United States Leasing Corporation v. Keiler, 290 So.2d 427 (La.App. 4th Cir.1974); Davis v. Humble Oil & Refining Company, 283 So.2d 783 (La.App. 1st Cir.1973); Palmer v. Chamberlin, 191 F.2d 532 (5th Cir.1951); Fine v. Property Damage Appraisers, Inc., 393 F.Supp. 1304 (E.D.La. 1975).
The choice of law provision contained in Louisiana's Lease of Movables Act, La.R.S. 9:3301 et seq. (1994), which now applies to all leases of movable property located in this *331 state, treats this issue in a similar manner.[2] Louisiana R.S. 9:3303(B) (1994) provides, in pertinent part, that:
Subject to the provisions of R.S. 9:3303(D), (E), and (F), a lease agreement affecting movable property located or to be located in Louisiana may provide that the transaction will be governed under the substantive laws of the state in which the lease is entered into or governed under the substantive laws of the state of the lessor's residence, principal office, or incorporation or governed under the substantive laws of any other state having significant contacts with the transaction.
Subsection (D) addresses the lessor's enforcement of remedies against the lessee of movable property. According to this provision, if the leased property is located in Louisiana and the lessee defaults, then the lessor shall comply with the remedy provisions set forth in La.R.S. 9:3318 through 3330 (1994). This is so even if the lease agreement provides that the transaction is to be governed by the laws of another state. Subsection (E) addresses the charges that may be assessed against the defaulting lessee of movable property. Under this statute, when the lessor brings an action in Louisiana to enforce rights arising from the lease of movable property that is located in Louisiana at the time of the lessee's default, the lessor shall, where applicable, reduce the charges sought to be collected from the lessee so that they do not exceed the charges provided for in La.R.S. 9:3311 through 3317 (1994).
Based on the case law previously cited, unless we find that application of Pennsylvania law would contravene the public policy of Louisiana, the choice of Pennsylvania substantive law is enforceable as to all issues presented, except those dealing with default under Paragraph III of the lease, charges that may be assessed against the lessee, and the remedies available to the lessor.
The Morenos contend that there are strong public policy reasons which demand "sidestepping" the choice of law provision. They argue that the warranty disclaimer must be interpreted under Louisiana law, which provides that a waiver of warranties must be: (1) written in clear and unambiguous terms; (2) contained in a written contract; and (3) brought to the attention of the lessor or explained to him. The Morenos assert that these three requirements are expressions of public policy in Louisiana which protect purchasers from inadvertently waiving their rights to implied warranties. They claim that the purported waiver of warranty provision in Paragraph II of the lease is unclear and ambiguous, that Mr. Moreno was not made aware of the provision, and that it was not explained to him. Under these circumstances, the Morenos argue that Louisiana public policy demands applying Louisiana substantive law and finding that the warranties were not waived. We disagree.
Louisiana's statutory lease warranty provisions are contained in La.Civ.Code art. 2695, which provides:
The lessor guarantees the lessee against all the vices and defects of the thing, which may prevent its being used even in case it should appear he knew nothing of the existence of such vices and defects, at the time the lease was made, and even if they have arisen since, provided they do not arise from the fault of the lessee; and if any loss should result to the lessee from the vices and defects, the lessor shall be bound to indemnify him for the same.
This provision applies to the lease of both immovables and movables. La.R.S. 9:3309 (1994); Equilease Corporation v. Hill, 290 So.2d 423, 425 (La.App. 4th Cir.1974). The *332 implied warranty of La.Civ.Code art. 2695 arises by operation of law in every contract of lease. However, this warranty may be dispensed with as a condition of the contract of lease, and such waivers are not against Louisiana public policy. Tassin v. Slidell Mini-Storage, Inc., 396 So.2d 1261 (La.1981); Louisiana National Leasing Corporation v. ADF Service, Inc., 377 So.2d 92 (La.1979); First Continental Leasing Corporation v. Howard, 618 So.2d 642 (La.App. 2d Cir. 1993). To be effective, the waiver must be: (1) written in clear and unambiguous terms; (2) contained in a written contract; and (3) brought to the attention of the lessor or explained to him. Louisiana National Leasing Corporation, supra; Prince v. Paretti Pontiac Co., 281 So.2d 112 (La.1973).
While Louisiana's waiver of warranty requirements are intended to protect individuals from inadvertently waiving certain rights, they do not differ substantially from those applied in Pennsylvania, which also requires the waiver to be noticeable or conspicuous, written, and in certain clear and unambiguous terms. 13 Pa.C.S.A. § 2316. In this regard, Louisiana's and Pennsylvania's public policy is the same and there is no need to "sidestep" the choice of law clause in this case.[3]

WAIVER OF WARRANTIES UNDER PENNSYLVANIA LAW
Having found that Pennsylvania law governs all aspects of the lease, except those relating to default, remedies and charges, we now turn to the effectiveness of the waiver of warranty provision under that state's law.
Pennsylvania's "Sales" articles are based substantially upon those set forth in Article 2 of the Uniform Commercial Code, and are located at 13 Pa.C.S.A. §§ 2101 through 2725. Although the transaction at issue involves a lease, rather than a sale, the Pennsylvania courts have found that the "warranty" and "waiver of warranty" provisions applicable to sales, 13 Pa.C.S.A. §§ 2313 through 2316, may be applied by analogy to leases.[4]Cucchi v. Rollins Protective Services Co., 524 Pa. 514, 574 A.2d 565 (1990); Keblish v. Thomas Equipment, Ltd., 427 Pa.Super. 93, 628 A.2d 840 (1993); Fetrow, Uniform Commercial CodePennsylvania Applies Article 2 Warranty Provisions to Personal Property Lease Transactions Cucchi v. Rollins Protective Services, 64 Temp.L.Rev. 355 (1991).
The applicable warranties are set forth in 13 Pa.C.S.A. §§ 2314 and 2315, which provide, in pertinent part, that:
§ 2314. Implied warranty; merchantability; usage of trade
(a) Sale by merchant.Unless excluded or modified (section 2316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind....
(b) Merchantability standards for goods.Goods to be merchantable must be at least such as:
* * * * * *
(3) are fit for the ordinary purposes for which such goods are used.
§ 2315. Implied warranty: fitness for particular purpose
Where the seller at the time of contracting has reason to know:
(1) any particular purpose for which the goods are required; and
(2) that the buyer is relying on the skill or judgment of the seller to select or furnish suitable goods; *333 there is unless excluded or modified under § 2316 (relating to exclusion or modification of warranties) an implied warranty that the goods shall be fit for such purpose.
To exclude or modify the implied warranty of merchantability, according to 13 Pa.C.S.A. § 2316, the written contract language must mention merchantability and must be conspicuous. To exclude or modify the implied warranty of fitness, the exclusion must be in writing and conspicuous. The statute also provides that, "Language to exclude all implied warranties of fitness is sufficient if it states, for example, that `There are no warranties which extend beyond the description on the face hereof.'"
A term is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. 13 Pa.C.S.A. § 1201. See also, Keblish, supra; Moscatiello v. Pittsburgh Contractors Equipment Company, 407 Pa.Super. 363, 595 A.2d 1190 (1991), appeal denied, 529 Pa. 650, 602 A.2d 860 (1992). Additionally, language in the body of a form is conspicuous if it is in larger or other contrasting type or color. 13 Pa.C.S.A. § 1201.
Some of the important characteristics that Pennsylvania courts consider when determining whether a reasonable person should have noticed the disclaimer include: (1) the placement of the clause in the document (beginning/end or front/back of document); (2) the size of the disclaimer's print; and (3) whether the disclaimer was highlighted or called to the reader's attention by being in all caps or a different type style. Keblish, supra; Moscatiello, supra; U.S. Leasing Corporation v. Stephenson Equipment, Inc., 230 Pa.Super. 181, 326 A.2d 472 (1974).
The waiver of warranty provision at issue provides:
II WARRANTIESLESSEE AGREES THAT LESSOR HAS MADE NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, NATURE OR DESCRIPTION, EXPRESS OR IMPLIED AS WITH RESPECT TO ANY OTHER MATTER WHATSOEVER, INCLUDING WITHOUT LIMITATION, THE CONDITION OR USE OF THE EQUIPMENT, ITS MERCHANTABILITY, OR ITS FITNESS FOR ANY PARTICULAR PURPOSE. (Caps and bold in original.)
This provision is located on the front side of the lease, which is one page in length with printed information on both sides. Furthermore, it is located almost directly in the middle of the front page of the lease, and is immediately noticeable because it is in larger type, all caps and boldfaced. The majority of the printed information is smaller in size, not boldfaced and not capitalized. It is the only capitalized and boldfaced paragraph that is listed under the section entitled TERMS AND CONDITIONS OF LEASE.
We find that the warranty disclaimer here is sufficiently noticeable to satisfy the conspicuousness requirement of 13 Pa.C.S.A. § 2316. The warranty disclaimer also satisfies the remaining requirements of 13 Pa. C.S.A. § 2316 because it is "written" and makes specific reference to "merchantability."
As such, the Morenos waived any breach of warranty claims that they may have had against Walnut. According to the terms of the lease, the Morenos bore the risk that the tire changer was merchantable and that it would be fit for its particular purpose. A waiver of claims against Walnut for nonsatisfactory condition or defective conditions of the leased equipment was an effective allocation of foreseeable risks.

FAIRNESS AND UNCONSCIONABILITY
The Morenos have obligated themselves to tender all rental payments, regardless of the condition of the tire changer. This is provided for in the lease, which has the phrase, "THIS LEASE IS NON-CANCELLABLE" (bold and caps in original), typed just above the signature lines on the front page. Further, the "Certificate of Acceptance and Satisfaction," signed by Mr. Moreno, provided that:
Lessee further acknowledges the following:
e) that if the equipment is not properly installed, does not operate as represented by supplier, or is unsatisfactory for any *334 reason, Lessee shall make claim on account thereof solely against supplier and shall nevertheless pay Lessor all rent payable under this Lease; Lessee hereby waiving any and all rights, claims and set-offs against the Lessor that might otherwise have arisen under the Lease agreement. (Emphasis added.)
The Morenos contend that enforcement of both these provisions and the warranty disclaimer would be unfair because: (1) Mr. Moreno is an unsophisticated lessee who was not given an opportunity to read the lease, and was not explained the terms of the lease; (2) it is unconscionable to require Mr. Moreno to waive all warranties, while at the same time demanding the payment of all rentals due under the lease. We disagree.
Mr. Moreno testified that he completed seven years of formal education and received a General Equivalency Diploma or G.E.D. He is able to read and write. Furthermore, Mr. Moreno has been an insurance agent for ten years, and is the proprietor of his own insurance agency. While Mr. Moreno has no college education or formal corporate titles, he is a small businessman with significant experience in business matters. His insurance agency has apparently been successful enough to remain open for a number of years. As owner, Mr. Moreno must have some influence on the business and its success must be attributable to him. Furthermore, the nature of the insurance business leads us to believe that Mr. Moreno must understand the purpose of entering into written contracts, and the significance of reading contractual terms before signing an instrument.
Mr. Moreno is not uneducated and unsophisticated in business matters. He admitted that he did not read the lease, and acknowledged that he should have done so. Under Pennsylvania law, in the absence of proof of fraud, the failure to read a contract one signs is an unavailing excuse or defense, and can not justify an avoidance, modification or nullification of the contract or any provision thereof. Estate of Brant, 463 Pa. 230, 344 A.2d 806 (1975); Stanley A. Klopp, Inc. v. John Deere Co., 510 F.Supp. 807 (E.D.Pa. 1981), affirmed, 676 F.2d 688 (3d Cir.1982).
With regard to the Morenos' claims of unconscionability, we look to 13 Pa.C.S.A. § 2302, which provides:
(a) Finding and authority of court.If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made, the court may:
(1) refuse to enforce the contract;
(2) enforce the remainder of the contract without the unconscionable clause; or
(3) so limit the application of any unconscionable clause as to avoid any unconscionable result.
(b) Evidence by parties.When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.
Although this provision is contained within Pennsylvania's "Sales" Articles, it has been applied to leases. Bishop v. Washington, 331 Pa.Super. 387, 398, 480 A.2d 1088, 1093 (1984), citing Leasing Service Corp. v. Broetje, 545 F.Supp. 362 (S.D.N.Y. 1982). Whether a contract or clause is unconscionable is a question of law. Stanley A. Klopp, supra. Generally the party challenging a contract or a particular contract term has the burden of proving unconscionability. Bishop, supra.
According to the Pennsylvania Supreme Court, the test of unconscionability is twofold. First, for a contract or a term to be unconscionable, the party signing the contract must have lacked a meaningful choice in accepting the challenged provision. Second, the challenged provision must unreasonably favor the party asserting it. Witmer v. Exxon Corp., 495 Pa. 540, 551, 434 A.2d 1222, 1228 (1981).
The Morenos have failed to meet their burden of proving that, as the parties signing the lease, they lacked a meaningful choice in accepting the terms and conditions thereof. Mr. Moreno testified that he debated about *335 whether to lease or purchase the tire changer. After consulting with two certified public accountants, he opted to lease the machine for tax advantages. There is no evidence that Mr. Moreno attempted to negotiate or change any terms of the lease. Additionally, Walnut was not the only lease financing company available. Had they objected to the terms of the lease and Walnut refused to modify them, the Morenos could have requested that Webb suggest another lessor or the Morenos could have found their own leasing company. If this avenue proved impractical, the Morenos simply could have purchased the tire changer from Webb. Where, as here, a contract provision affects commercial entities with meaningful choices at their disposal, the clause in question will rarely be deemed unconscionable. Vasilis v. Bell of Pennsylvania, 409 Pa.Super. 396, 399, 598 A.2d 52, 54 (1991).
We also find that these provisions do not unreasonably favor Walnut. They are provisions commonly found in three-party lease transactions, and the Morenos are not left without recourse.
Walnut's president, William Shapiro, testified that his company is strictly a "financing lessor," which does not engage in selection of the equipment leased. According to Shapiro, the potential lessee fills out a Walnut application form which denotes the particular piece of equipment that the lessee desires to lease. Walnut then reviews the application, researches the lessee's credit history, and, if the company accepts the application, sends a purchase order to the equipment supplier to purchase the equipment. The equipment is then delivered by the supplier directly to the lessee.
In this type of three-party lease, the lessor is merely the financing arm of the transaction, separate and distinct from the supplier or manufacturer of the equipment covered by the lease. It is not uncommon in this type of arrangement for the parties to agree that all warranties between the lessor and lessee are waived; that the lessee shall make all rental payments under the lease, even if the equipment is defective, unmerchantable or unfit; and that the lessee shall pursue any claims, including those for breach of warranty, against the supplier and/or manufacturer. See, e.g., U.S. Leasing Corporation, supra.[5] This protects the lessor from having to bear the risk of defective, unmerchantable or unfit equipment. Instead, the risk ultimately falls to the suppliers and/or manufacturers, who are in a position to prevent such problems.
Walnut and the Morenos agreed that the Morenos would pursue all of their claims against the tire changer's supplier and manufacturer, respectively Webb and Perfect Hofman Corporation. As provided in the Certificate of Acceptance: "... if the equipment is not properly installed, does not operate as represented by supplier, or is unsatisfactory for any reason, Lessee shall make claim on account thereof solely against supplier and shall nevertheless pay Lessor all rent payable under this Lease; Lessee hereby waiving any and all rights, claims and set-offs against the Lessor that might otherwise have arisen under the Lease agreement." The Morenos are relegated to pursuing any breach of warranty, reimbursement, indemnity, contribution or other claims against Webb and Perfect Hofman Corporation.[6]

CONCLUSION
As discussed earlier, Louisiana law governs the issues of default, the "remedies" available to Walnut, and the "charges" that may be assessed against the Morenos. Our review of the default provisions contained in *336 Paragraph III of the lease reveals that they comply with the statutory limitations on charges set forth in La.R.S. 9:3311 through 3317 (1994).
At the trial, Walnut introduced the Moreno's "Account Card" (Exhibit P-5), which contains a record of all rental payments tendered and owed. It shows that four rental payments were tendered, and that $3,640.00 in rent is outstanding. After adding 5 percent late charges, 25 percent collection fee, and 7 percent sales tax, as provided by the lease agreement, the Morenos are obligated to pay Walnut $5,463.64.
Possession of the tire changer is to be governed by La.R.S. 9:3319(C) and (D) (1994), which provides that after the Morenos satisfy their obligations to Walnut they must be permitted to remain in peaceable possession of the leased equipment for the balance of the lease term. See, e.g., First Continental Leasing, 618 So.2d at 645.

DECREE
For the reasons stated, the judgment of the trial court is reversed, and
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that there be judgment in favor of the plaintiff, Walnut Equipment Leasing Company, Inc., and against defendants, Clarence and Glenda Moreno d/b/a P & M Texaco, in the amount of Five Thousand Four Hundred and Sixty Three and 64/100 Dollars ($5,463.64), together with judicial interest upon the foregoing sum according to law. Possession of the subject property is to be governed by La. R.S. 9:3319 (1994).
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the reconventional demands of Clarence and Glenda Moreno d/b/a P & M Texaco against Walnut Equipment Leasing Company, Inc. are rejected at the Morenos' cost.
REVERSED AND RENDERED.
JONES, J. Pro Tem., concurs and assigns written reasons.
BROWN, J., dissents and assigns written reasons.
JONES, Judge Pro Tem., concurring.
I concur in the result reached by the majority. I write separately because I would find the result unconscionable if the Morenos and P & M Texaco Service did not have a right to timely proceed against the supplier and manufacturer of the Hofmann TC 12 SE, SN 1971091, described in the lease signed by them January 4, 1990.
Although the claim filed by the Morenos against the supplier, Webb Equipment Company, should have been a third-party demand, LSA-C.C.P. Art. 1111, rather than a reconventional demand, LSA-C.C.P. Art. 1061, it is my view that they may still amend and pursue their claims for damages against Walnut and against the manufacturer, Perfect Hofman Corporation, for the legally allowable damages suffered by them.
BROWN, Judge, dissenting.
Plaintiff buys the machine and leases it to defendant. Plaintiff, however, does not even guarantee that the machine is a tire-changer. The machine blows up within a month. Plaintiff now wants defendant to continue to make the lease payments for the unworkable machine. I find this result unconscionable. It should be plaintiff's responsibility to proceed against the supplier and manufacturer.
NOTES
[1] It is unclear when the tire changer was actually delivered. Mr. Moreno testified that it was delivered before he wrote the November 30, 1989, check to Walnut. However, Walnut's president, Mr. Shapiro, testified that it was customary for the equipment to be delivered only after Walnut accepted the lease and issued a purchase order to the supplier. Apparently the request for delivery of the tire changer to P & M Texaco in the January 4, 1990, purchase order was merely a formality.
[2] In 1991, this principle of law was incorporated into the statutory framework of the Civil Code when the Louisiana legislature passed Act No. 923. Louisiana Civ.Code art. 3540 provides that all issues of conventional obligations, besides "form" and "capacity," are governed by the law expressly chosen or clearly relied upon by the parties, except to the extent that law contravenes the public policy of the state whose law would otherwise be applicable under Article 3537. Even though this article applies only to actions filed after January 1, 1992, it is relevant to the case at hand because it again shows consistency of treatment of this issue by the legislature and judiciary. See Symeonides, Louisiana Conflicts Law: Two "Surprises", 54 La.L.Rev. 497, 505 n. 41 (1994), which recommends that courts at least consider the new law in cases decided after January 1, 1992, even if the actions were filed before the effective date of Act No. 923.
[3] Our study of the lease indicates that even if we were to apply Louisiana substantive law to this case, the waiver of warranty provision would probably be effective. The three requirements have been satisfied. The waiver was written and its language is clear and unambiguous. Finally, the provision was brought to Mr. Moreno's attention by Walnut. It was not buried in the middle of the back page of the lease in small type. On the contrary, as discussed later in this opinion, the waiver of warranty was placed in the middle of the front page, and was distinguished from the remaining provisions by bold, capitalized letters.
[4] It is noteworthy that, effective July 9, 1993, the Pennsylvania legislature enacted the "Uniform Commercial Code Modernization Act," Act No. 1992-97. By this legislation, Article 2A, Leases, was codified at 13 Pa.C.S.A. § 2A101 et seq. The Article 2A warranty provisions for leases are essentially the same as those for sales.
[5] See also, David Nutt & Associates, P.C. v. First Continental Leasing Corporation, 599 So.2d 576 (Miss.1992); Uniflex, Inc. v. Olivetti Corporation of America, 86 A.D.2d 538, 445 N.Y.S.2d 993 (1982); Union Commerce Leasing Corp. v. Beef'N Burgundy, Inc., 155 Ga.App. 257, 270 S.E.2d 696 (1980); All-States Leasing Company v. Ochs, 42 Or.App. 319, 600 P.2d 899 (1979); and Badger Bearing Company v. Burroughs Corporation, 444 F.Supp. 919 (E.D.Wisc.1977), affirmed, 588 F.2d 838 (7th Cir.1978).
[6] We note that in their reconventional demand the Morenos named Webb as a defendant-in-reconvention despite the fact that Webb was not a party plaintiff in the main lawsuit. The record before us contains no evidence indicating that Webb was served, no pleadings were filed by Webb, and it did not participate in the trial.