836 So.2d 239 (2002)
John MARIEN and Marilyn Marien, Individually and on behalf of Joshua Paul Marien, Justin André Marien, and Jacob Charles Marien,
v.
GENERAL INSURANCE COMPANY OF AMERICA, Barham Bros., Inc. and Robert L. Adams.
No. 02-545.
Court of Appeal of Louisiana, Third Circuit.
December 11, 2002.
Rehearing Denied January 15, 2003.
*241 Roy S. Halcomb, Jr., Alexandria, LA, Attorney for the Plaintiffs/Appellees John and Marilyn Marien.
Vance E. Ellefson, New Orleans, LA, Attorney for the Defendants/Appellants Barham Brothers, Inc. and General Insurance Company of America.
John Hoychick, Jr., Rayville, LA, Attorney for the Defendant/Appellee Robert L. Adams.
Jeffery A. Riggs, Alexandria, LA, Attorney for the Third Party Defendant/Appellee Earl Cherry.
Court composed of NED E. DOUCET, Jr., Chief Judge, MICHAEL G. SULLIVAN and GLENN B. GREMILLION, Judges.
DOUCET, Judge.
This appeal arises out of a plane crash near Alexandria, Louisiana.
The trial court correctly summarized the underlying facts as follows:
John Marien, the plaintiff, was seriously injured in a plane crash that occurred near Alexandria, Louisiana on November 24, 1997. The plaintiff works for the Federal Bureau of Prisons as a landscape foreman. He is also a farmer and pilot who was attempting to fly his own plane to spray his fields for agricultural purposes. At the time of the accident, Mr. Marien had flown a number of airplanes and had approximately 275 to 280 hours of flying time. Mr. Marien had to get 10 hours flying time in the Ag-Cat for his insurance to cover him in his own plane. Mr. Marien testified that he went to Rayville, Louisiana and flew an Ag-Cat for three hours. The Ag-Cat involved in this case is owned by the defendant, Barham Brothers, Inc. The plaintiff paid the defendant, Mr. Edwards Barham, $250.00 an hour for flying time in Rayville and assumes that Barham paid the instructor, Mr. Guillot.
The plaintiff was subsequently attempting to get more hours in the Ag-Cat when the crash occurred. Mr. Earl Cherry, who operated the Summerville Airport, near Alexandria, was asked by the defendant, Mr. Barham, if he would fly the Ag-Cat for him. Mr. Cherry, an experienced pilot with over 20,000 hours, was to take student pilots up in the plane so they could obtain experience flying the Ag-Cat airplane. Barham would be paid $250.00 an hour for the plane and instructor and the instructor would be paid by Barham the sum of $250.00 to $300.00 per day. All of the instructors that flew for Mr. Barham had to be placed on Mr. Barham's policy *242 of insurance with the defendant, General Insurance Company of America. Both Mr. Barham and Mr. Cherry testified that they wanted to make certain that Mr. Cherry was listed on the policy. Mr. Barham would not allow Mr. Cherry to fly the plane until he was listed on the policy. Mr. Cherry was added to the policy on November 24, 1997, the day of the accident. Mr. Marien, who had known Mr. Cherry for a long time, was the first student to fly under this arrangement.
According to the testimony, Mr. Barham and Mr. Guillot, on the day of the accident, flew two planes from Rayville to Summerville Airport where they met with the plaintiff, John Marien, and Mr. Earl Cherry. After a brief visit and a walk around of the Ag-Cat, Barham and Guillot got in one of the planes and returned to Rayville leaving the Ag-Cat with Marien and Cherry. After Mr. Barham left, Mr. Cherry fueled the Ag-Cat.
Mr. Cherry was in the front cockpit and the plaintiff, John Marien, was in the back cockpit of the Ag-Cat. Marien taxied the plane out onto the runway. It was a beautiful day with little wind. Marien and Cherry both testified that the plane functioned properly during the moments prior to and upon take off. However, both men testified that shortly after take off the nose of the plane came up quickly. Pilots describe the condition as nose high attitude. Cherry told Marien to get the nose of the plane down. Marien testified that he was trying to get the nose down by pushing forward on the stick but that the stick would not go forward and appeared to be jammed. Mr. Cherry also attempted to push the stick forward and also found the control jammed. Mr. Cherry testified that the plane reached a maximum altitude of approximately 150 feet. The plane would appear to stall out due to the nose high attitude. Mr. Cherry testified that the plane would gain altitude then subsequently lose altitude. The plane ultimately struck a large tree and came to rest on its right side.
Mr. Marien asserts that he sustained injuries to his back and left leg as a result of the accident. He and his family filed this suit naming as defendants Barham Bros., Inc., General Insurance Company of America (GIC), and Robert L. Adams, who inspected the plane. GIC and Barham Bros. filed a third party demand against Earl Cherry. GIC denied coverage of Cherry and Adams and refused to provide a defense on their behalf. Cherry and Adams filed demands against Barham Bros. and GIC.
After a trial on the merits, the trial judge found that the crash was caused by a malfunction or defect in the controls of the aircraft. He found that Cherry and Adams were insured under Barham Bros.' policy of insurance with GIC and that GIC owed them a defense as a result. He rendered judgment in their favor against GIC in the amount of $22,500.00 each. However, he found no fault on the part of Cherry or Adams. The court rendered judgment against Barham Bros. and GIC, jointly and in solido, and in favor of the Mariens. He awarded damages as follows: "[I]n favor of plaintiff, JOHN MARIEN, in the full sum of $194,047.78, in favor of plaintiff, MARILYN MARIEN, in the full sum of $12,500.00, and in favor of plaintiffs, JOSHUA MARIEN, JUSTIN MARIEN and JACOB MARIEN, in the full sum of $2,500.00 each...." The court limited the liability of GIC to its $100,000.00 policy limits plus legal interest.
GIC and Barham Bros. appeal the trial court's judgment against them. The Mariens appeal the finding that GIC's coverage *243 limit is $100,000.00 and re-asserting claims against Cherry and Adams in the alternative. Cherry and Adams have answered the appeals asking for penalties and attorney's fees for failure to provide a defense.

CAUSE OF THE ACCIDENT
GIC and Barham Bros. first contest the trial court's finding that the crash was caused by a malfunction of or defect in the aircraft. In brief, these Defendants assert that:
The court made no finding of negligence. The evidence showed that the aircraft controls operated properly both before and after the plaintiffs flew the aircraft into a tree. There was no impediment found to the operation of the controls. The District Court held that, despite the lack of evidence of a defect, that is a flaw or fault or condition of relative permanence existing or inherent in the aircraft as one of its qualities, the owner of the aircraft was strictly liable for damages allegedly suffered by the pilot, John Marien.
The Defendants assert that the trial court erred in finding Barham liable without proof of a defect. However, the trial court found that a defect existed. In its reasons for judgment the trial court stated that it accepted as fact that the control stick jammed causing the accident. The court then found that Barham Bros., as lessor of the aircraft, was strictly liable for the defective condition of the aircraft.
The Defendants further assert that the trial court erred in finding that the Plaintiffs did not have to prove the cause of the defect. However, it is undisputed that Marien leased the aircraft from Barham Bros. Therefore, the trial court correctly applied La.Civ.Code art. 2695, which states that:
The lessor guarantees the lessee against all the vices and defects of the thing, which may prevent its being used even in case it should appear he knew nothing of the existence of such vices and defects, at the time the lease was made, and even if they have arisen since, provided they do not arise from the fault of the lessee; and if any loss should result to the lessee from the vices and defects, the lessor shall be bound to indemnify him for the same.
"This provision applies to the lease of both immovables and movables." Walnut Equip. Leasing Co., Inc. v. Moreno, 26,004 (La.App. 2 Cir. 9/21/94); 643 So.2d 327, 331. A defect, for purposes of Art. 2695, has been defined as "a dangerous condition reasonably expected to cause injury to a prudent person using ordinary care under the circumstances." Martinez v. Coleman, 00-1827, p. 7 (La.App. 5 Cir. 4/24/01); 786 So.2d 170, 173. To recover under Art. 2695, it is not necessary to prove the cause of the defect. A lessee must prove only the existence of the defect. Freeman v. Julia Place Ltd. Partners, 95-0243 (La.App. 4 Cir. 10/26/95); 663 So.2d 515, writ denied, 95-2808 (La.1/26/96); 666 So.2d 680.
In order for a lessee to recover damages from the lessor under this article due to an alleged vice or defect in the leased premises, the lessee must prove by a preponderance of the evidence that a defect existed in the premises and that the defect caused the damages. Green v. Hodges Stock Yard, Inc., 552 So.2d 435 (La.App. 4th Cir.1989).
Proof by direct or circumstantial evidence is sufficient to constitute a preponderance if, taking the evidence as a whole, such proof shows that the fact or causation sought to be proved is more probable than not. Green v. Hodges Stock Yard, Inc., 552 So.2d at 439. Causation *244 may be proved by circumstantial evidence, and that evidence need not negate all possible other causes, but it must exclude other reasonable hypotheses with a fair amount of certainty. Buxton v. Allstate Insurance Company, 434 So.2d 605 (La.App. 3rd Cir.1983).
Home Ins. Co. of Illinois v. National Tea Co., 577 So.2d 65, 77 (La.App. 1 Cir.1990), aff'd in pt; rev'd in pt. on other grounds, 588 So.2d 361 (La.10/21/91).
The Defendants do not contest the trial court's summary of testimony concerning the accident, which, having reviewed the record, we find to be correct and adopt as our own:
Mr. Cherry was in the front cockpit and the plaintiff, John Marien, was in the back cockpit of the Ag-Cat. Marien taxied the plane out onto the runway. It was a beautiful day with little wind. Marien and Cherry both testified that the plane functioned properly during the moments prior to and upon take off. However, both men testified that shortly after take off the nose of the plane came up quickly. Pilots describe the condition as a nose high attitude. Cherry told Marien to get the nose of the plane down. Marien testified that he was trying to get the nose down by pushing forward on the stick but that the stick would not go forward and appeared to be jammed. Mr. Cherry also attempted to push the stick forward and also found the control jammed. Mr. Cherry testified that the plane reached a maximum altitude of approximately 150 feet. The plane would appear to stall out due to the nose high attitude. Mr. Cherry testified that the plane would gain altitude then subsequently lose altitude. The plane ultimately struck a large tree and came to rest on its right side.
The accident was investigated the following day by Mr. Gillespie, a representative of the Federal Aviation Administration. Mr. Gillespie testified by deposition that he removed the left side panel of the airplane and looked into the insides of the plane. He testified that he found a battery box lid that was loose in the compartment. He further testified that he found small indentions (sic) on the battery box lid which he said were unusual.... Additionally he testified to finding rub marks on the elevator control push tube on the forward end of the control tube which is closest to the pilot's control stick.... The numerous screws that held the battery box lid in place were not found. The plaintiff contends that the battery box lid, which admittedly was loose inside the plane, somehow jammed the controls of the plane preventing the stick from operating properly. However, the defendant contends that the control stick did not function properly because the gust lock was on the stick. The gust lock attaches to the control stick and firmly holds it in place. The lock is painted red and made of iron. When it is attached the lock is clearly visible and the stick will not move at all to the front, back or either side. The Court went to view the plane and tried to move the stick with the lock attached and with the lock off. The feel of the stick with the lock attached is distinctive, and this Court doesn't believe that anyone could taxi this plane holding the control stick and not know the gust lock was engaged. In order to get around this problem, Mr. Clark, the defendant's expert testified that he believes that the gust lock was intentionally put on after the plane was taxied onto the runway. While this would explain why the controls functioned normally as the plane taxied to the runway for the take off, it would assume that the plaintiff intentionally attempted *245 to take off in a plane with a locked control stick. The Court doesn't accept this version of the facts.
Mr. Adams performed an annual inspection of the plane in October 1997, shortly prior to the accident. During the course of the inspection Mr. Adams admitted that he removed the battery box cover but he testified that he replace the cover on the battery and even put additional screws in the lid to replace those screws that were missing at the time of the inspection. The evidence at the trial indicates that a new battery was purchased for the plane and put in the plane sometime after the annual inspection. Mr. Adams was named as a defendant in this matter and the plaintiff contended that he failed to replace the battery lid cover. The evidence adduced at the trial failed to establish the negligence of Mr. Adams.
. . . .
There is no question but that shortly after takeoff the control stick jammed and both Marien and Cherry testified that they could not push the stick forward. This evidence is uncontradicted and Mr. Cherry made a statement to this effect immediately after the accident. The Court accepts the fact that the control stick jammed.
Given the testimony adduced at trial, the circumstantial evidence is sufficient to show that it is more probable than not that a defect in the plane existed and caused the accident. Therefore, we find no error in the determination of the trial court in this regard.

DUTY TO DEFEND
Barham Bros. and GIC next assert that the trial court erred in finding that they had a duty to provide a defense for Cherry and Adams.
Generally, the insurer's obligation to defend suits against its insured is broader than its liability for damage claims. The insurer's duty to defend suits brought against its insureds is determined by the allegations of the plaintiff's petition, and the insurer is obligated to defend the insured, unless the petition unambiguously excludes coverage. The allegations in the petition are to be construed liberally to determine whether they state grounds bringing the claims within the scope of the insurer's duty to defend. Assuming all the allegations of the petition to be true, if there would be coverage under the policy and also liability to the plaintiff, the insurer must defend the suit, regardless of the outcome of the suit. The duty to defend arises whenever the pleadings against the insured disclose even a possibility of liability under the policy. The duty to defend is determined solely from the plaintiff's pleadings and the face of the policy, without consideration of extraneous evidence.
Scottsdale Ins. Co. v. Those Certain Underwriters Subscribing to Policy No. LPK 0762 at Lloyd's of London, 02-190, p. 4 (La.App. 5 Cir. 6/26/02); 822 So.2d 805, 807-08 (footnote omitted), quoting Houghtaling v. Richardson, 01-208 (La.App. 5th Cir.10/17/01); 800 So.2d 1012.
Therefore, we may consider only the language of the policy and the allegations of the petition in determining whether GIC had a duty to defend Adams and Cherry. We may not consider any of the other evidence which GIC feels to be pertinent to the claims.

1. Duty to Defend Adams.
The GIC insurance policy defines insured as follows:
The unqualified word "Insured," wherever used in the policy with respect to Coverages A, B, C and D, includes not *246 only the Named Insured, but also any person while using or riding in the aircraft and any person or organization legally responsible for its use, provided the actual use is by or with the permission of the Named Insured. The insurance with respect to any person or organization other than the Named Insured does not apply to:
a. any person or organization, for hire or reward, engaged in the instruction, evaluation, examination, or certification of any pilot or prospective pilot; or
b. any person or organization, or any agent or employee thereof, other than agents or employees of the Named Insured, engaged in commercial aviation operations, either in whole or in part, including but not limited to, the manufacture, sale, repair or service of any aircraft, aircraft engines or other aircraft accessories or components, commercial flying service, aerial applicating service, airport, hangar, pilot training service, air charter or cargo service, scheduled airline or aircraft salvage service.
The unqualified word "Insured," wherever used in the policy with respect to Coverages A, B D, and E, does not include any officer, director, partner or employee with respect to injury or death of another officer, director, partner or employee of the same employer injured in the course of the duties of employment.
With regard to Adams, the Plaintiffs' original and amended petitions allege that:
6.
In October of 1997, BARHAM BROS., INC. conducted or commissioned the conduct of the FAA annual inspection for the "Ag-Cat."
7.
The annual inspection was performed by ROBERT L. ADAMS.
8.
While conducting the inspection, ROBERT L. ADAMS was acting as a servant or employee of BARHAM BROS., INC. for purposes of Louisiana Civil Code Article 2320.
9.
BARHAM BROS., INC. is responsible for the acts and omissions of ROBERT L. ADAMS during the time that he was performing the annual inspection upon the "Ag-Cat."
. . . .
15.
The post-accident investigation did reveal evidence that the battery box cover located in the fuselage of the aircraft under the pilot's seat had not been properly secured to the battery box. The battery box cover became dislodged during flight and jammed in the mechanical linkage between the pilot's "stick" and the push/pull rods for the aircraft's elevator control surfaces. The loss of aerodynamic control and resulting crash were a result of the jammed control linkage.
16.
The failure to secure the battery box cover was caused wholly or in part by the fault and/or negligence of ROBERT L. ADAMS for failing to properly inspect his own work after performing the annual inspection, failing to follow the appropriate checklist and procedures, and failing to take other steps which would have prevented the control failure.

*247 . . . .
18(b)
After the crash, the "AgCat" was inspected by the National Transportation Safety Board. The inspection showed that the battery cover was loose inside the fuselage and that there were markings on the battery cover and the elevator control rod which indicated that the crash was caused by the loose battery cover that jammed the elevator control rod and this restricted the movement of the elevator control system. The battery cover is held in place by 8 or more attachment bolts. When the "Ag-Cat" was inspected immediately following the crash, all of the attachment bolts were missing. As is obvious, the attachment bolts were not in place and the battery cover was loose when the "AgCat" was delivered to Mr. Marien.
. . . .
18(c)
The "AgCat" underwent an annual inspection which was completed only a few days before the crash. Shortly before the annual inspection was begun, Mr. Barham purchased and installed new batteries in the "AgCat". In order to replace the batteries, Mr. Barham had to remove the battery cover. Mr. Barham also participated in and was present during the annual inspection. The battery cover should have been checked during the annual inspection. As the owner and lessor of the "AgCat," Barham Brothers, Inc. had a duty to provide Mr. Marien with an airworthy airplane free of defects. This duty was delegated to Mr. Barham who was responsible for inspecting the "AgCat" for defects, such as the loose battery cover, before delivering the "AgCat" to Mr. Marien.
. . . .
18(d)
As concluded by the National Transportation Safety Board, the most probable cause of the crash was the loose battery cover that jammed the elevator control rod and restricted movement of the elevator control system. The most logical explanation for the battery cover being loose is that Mr. Barham did not secure the cover after installing new batteries and that neither he nor Mr. Adams thought it was necessary to actually physically remove the cover and check the batteries during or following the annual inspection because the batteries were new and had just been installed. This makes Mr. Barham and Mr. Adams both personally liable along with Barham Brothers, Inc.
Given the language of the policy, and assuming all the allegations of the petition as to Adams to be true, we cannot say that the policy unambiguously excludes coverage. Therefore, we find no error in the trial court's conclusion Adams is owed a defense.

2. Duty to Defend Cherry.
With regard to Cherry, the "Pilot Standards Endorsement" to the GIC policy states that:
Coverage provided by the policy shall not apply while the aircraft is in flight unless the pilot in command (and second in command, if required below) of the aircraft maintains a valid pilot's certificate and ratings (category, class and type) appropriate for the aircraft as required by the Federal Aviation Administration and is either a person named below who meets any additional qualifications set forth below, or any other person meeting all of any qualifications *248 set forth below. No other person may fly the aircraft.
1. AS RESPECTS PLEASURE AND BUSINESS FLIGHTS AND RENTAL TO OTHERS:
ANY PILOT MAINTAINING A PRIVATE OR MORE ADVANCED PILOT CERTIFICATE WHO HAS DEMONSTRATED TO EDWARDS BARHAM, JIMMIE LLOYD GUILLOTTE, LOWELL HINCHEE, OR ROBERT MCCURDY THE PILOTING SKILL REQUIRED FOR THE AIRCRAFT BEING FLOWN AND WHO HAS FLOWN A MINIMUM TOTAL PILOT IN COMMAND TIME OF 100 HOURS INCLUDING AT LEAST 25 HOURS IN AIRCRAFT WITH CONVENTIONAL (TAIL-WHEEL) LANDING GEAR AND 10 HOURS IN THE MAKE AND MODEL BEING FLOWN.
2. AS RESPECTS FLIGHT INSTRUCTION TO OTHERS:
NAMED PILOTS ONLY: EDWARDS BARHAM, JIMMIE LLOYD GUILLOTTE, LOWELL HINCHEE, ROBERT MCCURDY OR EARL CHERRY.
3. WITH RESPECT TO N2LU:
NAMED PILOTS ONLY: EDWARDS BARHAM, JIMMIE LLOYD GUILLOTTE, LOWELL HINCHEE, ROBERT MCCURDY OR EARL CHERRY.
4. ROBERT ADAMS BUT ONLY AS RESPECTS DELIVERY OR MAINTENANCE FLIGHTS.
GIC and Barham Bros. brought Cherry into this suit via a third party demand, making the following allegations:
(III)
Made Third Party Defendant is Earl L. Cherry, a person of the age of majority and a resident of the State of Louisiana.
(IV)
Assuming the position of third party plaintiffs, General Insurance Company of America and Barham Brothers, Inc., aver that they are not liable for, did not cause, and did not contribute in any way to the injuries complained of by John Marien. Third party plaintiffs aver that the injuries complained of, if any there were, resulted solely from the fault, acts, omissions and negligence of Earl Cherry, made third party defendant herein.
(V)
At all pertinent times, the aircraft in question was in the care, custody and control of John Marien and third party defendant Earl L. Cherry. Mr. Marien has alleged that he was a student pilot and that Earl L. Cherry was a Certified Flight Instructor who undertook to train Mr. Marien in the operation of the aircraft in question.
(VI)
At all pertinent times, third party defendant, Earl L. Cherry, was responsible for the care and well being of student pilot Marien and the aircraft. The injuries complained of, if any there were, resulted solely from error, acts and omissions on the part of Earl L. Cherry, who as Senior Pilot and Certified Flight Instructor, was charged with the duty of operating the aircraft in question in a safe manner and supervising and maintaining responsibility for the well being of John Marien, the student pilot.
In light of the fact that Cherry is specifically named as a covered pilot in the GIC policy and given the allegations made against him, we cannot say that the policy unambiguously excludes coverage for the alleged actions and/or inactions. Therefore, *249 the trial court correctly found that GIC owes Cherry a defense in this matter.

ARBITRARY AND CAPRICIOUS
Both Adams and Cherry assert that the trial court erred in failing to order GIC to pay penalties and attorney's fees for arbitrary and capricious failure to provide them with a defense to the claims against them.
Under La.R.S. 22:658(B)(1), an insurer's refusal to defend an insured as required under the terms of a policy subjects the insurer to a penalty of ten percent of the legal fees and costs incurred by the insured in defending the suit if that refusal is arbitrary, capricious, or without probable cause. See Parks Equipment Co. v. Travelers Ins. Co., 293 F.Supp. 1206 (E.D.La.1968). This section is penal in nature and is strictly construed. The burden is on the claimant to prove arbitrariness and capriciousness or lack of probable cause. Batiste v. Pointe Coupee Constructors, Inc., 401 So.2d 1263 (La.App. 1st Cir. 1981), writ denied, 409 So.2d 615 (La. 1981).
Sanders v. Wysocki, 92-1190, p. 8 (La.App. 4 Cir. 1/27/94); 631 So.2d 1330, 1335, writ denied, 94-0506 (La.4/22/94); 637 So.2d 156.
Considering the record before us, we cannot say that Adams and Cherry have carried their burden of showing that GIC acted arbitrarily and without probable cause. Therefore, we find no error in the trial court's denial of penalties and attorney's fees.

QUANTUM OF DAMAGES
GIC and Barham Bros. further assert that the trial court erred in making excessive damage awards to the Plaintiffs. The trial court awarded John Marien $194,047.78 for the damages he sustained in the accident. The court further made awards for loss of consortium to John Marien's wife, Marilyn, in the amount of $12,500.00, and to his three minor children, Joshua, Justin and Jacob, in the amount of $2,500.00 each. The court limited the liability of GIC to policy limits of $100,000.00, "plus legal interest from date of judicial demand and legal interest on the amounts awarded in excess of its policy limits from date of Judgment until payment of that part of the judgment that does not exceed its policy limits."
The trial court in its reasons for judgment explained its award to John Marien as follows:
John Marien was seriously injured in this accident. The plane hit the tree and then fell from 75 to 100 feet to the ground. The gas line ruptured and gasoline poured into the cockpit. He was trapped in the plane for a period of time prior to Mr. Cherry rescuing him. Mr. Marien testified that as he hobbled from the wreck he could hear the blood sploshing in his boot. This testimony was confirmed by Mr. Cherry. A piece of the propellor lacerated Mr. Marien's right lower leg. Pictures of the right leg are attached to the deposition of Dr. Jyoti Ganji taken on October 11, 2000. Mr. Marien testified that he was in severe pain, the worst pain he ever had, and he had surgery that night at Cabrini Hospital. He had a total of five surgical procedures. He was on crutches for two months, wore a splint for two months and used a cane for about a month. He testified that he was off work for four months and that he returned to work on March 23 or 24 of 1998. He actually returned to work on March 23, 1998. Dr. Ganji released him sometime in May. Mr. Marien has bad scarring and still has problems from the plane crash.
Dr. Ganji testified in his deposition that Marien had a problem with necrotic *250 or dead tissue that had to be removed. Dr. Ganji also testified that Marien had a nondisplaced hairline fracture of the pelvis. This condition did not require surgery and it subsequently improved. Dr. Ganji subsequently performed skin grafts in the area of the wound. Dr. Ganji testified that Marien also "had a real bad sprain of the C spine." dep. p 10
Dr. Ganji further testified:
"Q. Now after you examined Mr. Marien, what was your diagnosis?
A. We call this a plane crash, total body injury with major injuries involving the right lower extremity and to rule out any major injuries to the pelvic area because of the suspected fracture of the pelvic bone.
Q. And what treatment did you recommend?
A. Because it's a very grossly open wound with some devitalized plus some loss of tissue, we need[ed] to operate him as quickly to remove any bad tissue, remove any foreign body because it happened in the fields, that's why he was taken to the operating room as quickly." dep. p 10
Dr. Ganji testified:
Q. And can you described for us how the crushing and cutting type injury Mr. Marien sustained causes the kind of ongoing symptoms and problems that he has? How is that, why is that happening? What is it about this injury that causes that?
A. Number one is loss of tissue; number two is the healing by the body from the crush injury, replaced by the scar. There's no other way to replace it. And scar is tougher than natural tissues. And that restricts the movement of the muscles, tendon, in turn, movement of the joints. And all these are sequelae from those two main injuries he had.
Q. Am I correct that not only does the scarring and the internal scar tissue restrict movement of the muscles, it can also compromise the blood flow and nerves in that area of the injury?
A. They can trap the nerves and blood vessels too, yes.
Q. And that could be contributing to the kind of complaints he has?
A. Partly, yes.
Q. Okay. And what are some of the kinds of activities that you would expect to aggravate and cause symptoms in Mr. Marien's right leg.
A. Anything that involves the stretching of those muscle groups as we have, all we knew, all we saw were the lateral group but it was crush injury, there is no way to know how many muscle groups were involved, so anything that puts the stretch on those muscle groups, he'll have pain and restriction of motion.
Q. Would you expect an activity such as say prolonged standing to aggravate and cause symptoms in his leg?
A. Yes.
Q. Would you expect an activity such as climbing in connection with stairs or ladders or getting up to and off of heavy equipment, would those be the kind of activities that would aggravate and cause symptoms?
A. Positively.
Q. And then walking over uneven ground?
A. Yes.
Q. Running?
A. Heavy lifting or carrying heavy loads that required use of both legs?
Q. Exposing the leg to constant jarring or vibration such as might happen if a person had to operate heavy equipment, would that be the kind of thing *251 that would cause aggravation of symptoms in that leg?
A. Yes, sir.
Q And would you agree that Mr. Marien should try and avoid these types of activities that would aggravate and cause symptoms in his leg?
A. He might be trying to avoid, yes.
Q. And given the history in this case are you satisfied that the injuries that you treated Mr. Marien for were caused by this airplane crash that he gave you a history of?
A. Yes, sir.
Q. While under your care, did you find Mr. Marien to be what you considered a cooperative patient?
A. He was very good.
Q. And did you feel like that he was at all times honest and sincere with respect to his problems?
A. He is, yes.
The Court finds that John Marien is entitled to the sum of $75,000.00 in general damages for physical pain and suffering past, present and future. Mr. Marien is entitled to the sum of $35,000.00 for mental pain and suffering past, present and future. He is entitled to the sum of $25,000.00 for disability and loss of earning capacity. He is entitled to $12,000.00 for scarring and disfigurement. He is entitled to medical specials in the amount of $30,047.78 and loss wages in the amount of $17,000.00.
The trial court's reasons accurately reflect the evidence of record. In light of those facts, the award to John Marien appears to be within the discretion of the trial court. Therefore, we will not disturb the award on appeal.
Damages awarded by a jury are to be reviewed in the light most favorable to the prevailing party. O'Riley v. City of Shreveport, 30,107 (La.App.2d Cir.01/23/98), 706 So.2d 213. The discretion vested in the trier of fact is great, such that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993). Reasonable persons frequently disagree about the measure of general damages; therefore, it is only when the award is beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Id.

LeBlanc v. Barry, 00-709, p. 8 (La.App. 3 Cir. 3/1/01); 790 So.2d 75-81, writ denied, 01-1275 (La.6/15/01); 793 So.2d 1251, quoting Stroud v. Golson, 32-044, p. 5 (La.App. 2 Cir. 6/16/99); 741 So.2d 182, 185, writ denied, 99-2108 (La.10/29/99); 744 So.2d 1286.
With regard to loss of consortium, the jurisprudence establishes that:
In general, a claim for loss of consortium has seven elements: (1) loss of love and affection, (2) loss of society and companionship, (3) impairment of sexual relations, (4) loss of performance of material services, (5) loss of financial support, (6) loss of aid and assistance, and (7) loss of fidelity. Bell v. USAA Cas. Ins. Co., 30,172 (La.App.2d Cir.1/21/98), 707 So.2d 102, 110, writs denied, 98-0712, 98-0766 (La.5/8/98), 718 So.2d 433, 434; Finley v. Bass, 478 So.2d 608 (La. App. 2d Cir.1985). A loss of consortium award is a fact-specific determination, to be decided case-by-case and is disturbed only if there is a clear showing of an abuse of discretion. Rudd v. Atlas Processing Refinery, 26,048 (La.App.2d Cir.9/21/94), 644 So.2d 402, 411, writ denied, 94-2605 (La.12/16/94), 648 So.2d 392; Johnson v. Wal-Mart Stores, Inc., 616 So.2d 817 (La.App. 2d Cir.1993). *252 Quinn v. Wal-Mart Stores, Inc., 34,280, pp. 10-11 (La.App. 2 Cir. 12/6/00); 774 So.2d 1093, 1101-02, writ denied, 01-0026 (La.3/9/01); 786 So.2d 735.
The evidence adduced at trial established that Mr. Marien's family suffered losses appropriately recompensed by the award of damages for loss of consortium. The record supports the conclusion that Marien's family activities were severely curtailed and that his family suffered a loss of society, companionship and aid and assistance. Therefore, we find no abuse of discretion in the trial court's awards damages for loss of consortium.

POLICY LIMITS
The Mariens assert that the trial court erred in finding that policy limits of $100,000.00 apply to the accident. The Plaintiffs argue that the appropriate policy limit to be applied to this matter is $500,000.00.
In its reasons for judgment the trial court correctly noted that:
The insurance policy in this case provides for a limit of liability of $500,000.00 for each occurrence. The policy further provides a passenger bodily injury with a limit of $100,000.00 for each person. The plaintiff argues that there is a distinction between a pilot and a passenger and the distinction means that the limitation on coverage is $500,000.00 for a pilot instead of $100,000.00. The policy defines passenger to include pilot in Section 13 of the policy. That section provides as follows:
13. "`Passenger' means any persons, including pilots or other crew members, while in or boarding the aircraft for the purpose of riding or flying therein, or while alighting from the aircraft after a ride, flight or attempted flight therein."
The Court finds that the $100,000.00 limitation in the policy pertains to the injuries in this case.
We agree. The language of the policy is clear and unambiguous. "When the language of an insurance policy is clear and unambiguous, a reasonable interpretation consistent with the obvious meaning and intent of the policy must be given." Robinson v. Heard, 01-1697, p. 4 (La.2/26/02); 809 So.2d 943, 945. As a result, the trial court's finding in this regard is affirmed.

CONCLUSION
For these reasons, the judgment of the trial court is affirmed in its entirety. Costs of this appeal are assessed 70% to the Defendants. The remaining 30% of the costs are to be paid 10% by Cherry, 10% by Adams and 10% by the Mariens.
AFFIRMED.