## STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 22-71


## RICHARD AND JUDITH WILLIAMS

## VERSUS

## UNITED STATES FIRE INSURANCE, ET AL.


**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 268,548
HONORABLE MONIQUE FREEMAN RAULS, DISTRICT JUDGE

**********

## CANDYCE G. PERRET
## JUDGE

**********

Court composed of Elizabeth A. Pickett, Van H. Kyzar, and Candyce G. Perret, Judges.


**AFFIRMED.**

**Marne A. Jones**
**Mark A. Hill**
**Martin Schneider**
**Thompson, Coe, Cousins & Irons, LLP**
**650 Poydras Street, Suite 2105**
**New Orleans, LA   70130**
**(504) 526-4320**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
    **United States Fire Insurance Company**
    **Trip Mate, Inc.**

**Judith M. Williams**
**4501 Jackson Street, C-324**
**Alexandria, LA   71303**
**(318) 525-2708**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
    **Judith M. Williams**
    **Richard Williams**

**William M. Ford**
**Susan Ford Fiser**
**Ford Law Office, LLC**
**1630 Metro Drive**
**Alexandria, LA   71301**
**(318) 442-8899**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
    **Judith M. Williams**
    **Richard Williams**

**PERRET, Judge.**

This case is on appeal following a motion for summary judgment filed by Richard and Judith Williams, Plaintiffs-Appellees ("Plaintiffs"). United States Fire Insurance Company and Tripmate, Inc., Defendants-Appellants ("Defendants"), appeal the Judgment that granted Plaintiffs' motion for summary judgment. The judgment ordered Defendants to pay Plaintiffs' medical expenses and medically related travel expenses ($97,980.24), as well as statutory damages ($97,980.24) and attorney fees ($4,000.00). Court costs were also assessed against Defendants. Additionally, Plaintiffs filed a Motion to File a Later Answer and an Answer to Appeal requesting that they be awarded judicial interest from April 16, 2020, an increased award for attorney fees in the amount of $25,000.00, and costs incurred in both courts. We affirm the trial court's judgment but deny Plaintiffs' Motion to File a Later Answer.

**FACTS AND PROCEDURAL HISTORY:**

Plaintiffs purchased travel protection insurance for their trip when they booked a cruise to Norway with Viking Cruise Line. United States Fire Insurance Company ("USFIC") was the underwriter for Part B of the travel insurance policy, while Tripmate, Inc. ("Tripmate") was the adjuster for the insurance, and Generali Global ("Generali") was the contact for Plaintiffs while traveling abroad on the cruise. Part B included coverage for trip interruption, missed connection, travel delay, air flight only accidental death and dismemberment, medical expense/emergency assistance (accident & sickness medical expense; emergency medical evacuation, medical repatriation, and return of remains), non-medical emergency evacuation, baggage and personal effects, and baggage delay.

On March 10, 2020, during their trip, Mr. Williams presented to the ship infirmary with acute shortness of breath and chest pain. He was taken by ambulance to Helse Bergen Haukeland Universitetssjukehus, where he was treated for five days. Ultimately, Mrs. Williams hired private medical transport, REVA, which transported Mr. Williams back to the United States. REVA determined that emergency transportation was required and also that no lesser level of care was safe. Upon return, Mr. Williams was directly admitted to Intensive Care at Rapides Regional Medical Center.

On July 20, 2020, Plaintiffs filed a Petition for Damages asserting that the medical expenses and medical travel expenses they accrued were covered by the travel protection insurance they procured prior to their trip. The petition claims that USFIC was the underwriter for the medical expenses portion of the policy, and that Tripmate and Generali acted on behalf of USFIC. Additionally, Plaintiffs asserted that Generali was always kept informed of the situation and was asked to assist with transport home. However, Plaintiffs assert that Generali refused to speak with REVA representatives and did not provide its own transportation for Mr. Williams. Therefore, Plaintiffs concluded that Defendants breached the terms of the insurance contract and acted in bad faith. Further, Plaintiffs allege Tripmate continued to remain unresponsive to Plaintiffs' requests once Plaintiffs returned home. Plaintiffs asserted Unfair Trade Practices and unfair settlement practices in their petition. Further, Plaintiffs alleged that Defendants failed to timely pay their claims after receiving proof of loss, entitling Plaintiffs to penalties and attorney fees under La.R.S. 22:1964 and 22:1973.

After no answer was received, Plaintiffs moved for, and were granted, a preliminary default on October 26, 2020. The preliminary default was not

confirmed. On November 12, 2020, Generali was dismissed as a party at Plaintiffs' request.

Plaintiffs filed an Amended Petition for Damages on January 4, 2021, against Viking Cruise Line,[1] USFIC, and Tripmate. The amended petition asserted the disputed contract was a health and accident contract subject to La.R.S. 22:1821, that Tripmate refused to communicate with REVA and refused to provide transportation, and that Tripmate and USFIC acted in bad faith in failing to assist in arrangements and in failing to honor the terms of the insurance contract.

Thereafter, Plaintiffs filed a Motion for Summary Judgment against USFIC and Tripmate on the issue of liability for failing "to pay insurance claim within the period permitted by law" as well as double and special damages. Plaintiffs asserted that Tripmate was kept apprised of Mr. Williams's medical emergency through Generali, refused to respond to requests for assistance, and failed to respond to the emergency within two days as required by La.R.S. 22:1821. Additionally, Plaintiffs alleged the related bills and claims were not paid or resolved within thirty days as required by La.R.S. 22:1821(A). Lastly, Plaintiffs asserted USFIC failed to timely answer a request for admissions and, consequently, those requests are deemed admitted. Attached to the motion was the Request for Admissions, First Set of Interrogatories and Request for Production, and the Affidavit of Steve Williams, RN, CEN, CFRN, Director of Global Air Medical Operations, REVA.

The motion was unopposed and granted on May 3, 2021. However, Defendants filed a Motion to Vacate and Motion for New Trial alleging breakdowns

---

[1] Viking Cruise Line was dismissed as a party on March 11, 2021.

3

in notice and service of the motion. After a hearing on June 14, 2021, the May 3, 2021 Judgment was vacated and the Motion for New Trial was granted.

Plaintiffs subsequently filed a second Motion for Summary Judgment, which included several exhibits: Affidavit of Judith Williams with attachments (Advertisement for Insurance and Travel Protection Plan #UF425V with Louisiana Amendatory Endorsement[2]); Affidavit of Steve Williams (REVA); Affidavit of Richard Williams; Plaintiffs' Request for Admissions; and USFIC's responses to the Request for Admissions.[3] Mrs. Williams's affidavit related her prior experience as a registered nurse, facts pertinent to the cruise and procuring the travel insurance, facts regarding Mr. Williams's medical event and hospital stay, and discussed the Norwegian hospital facilities. Mrs. Williams also attested to the lack of communication and participation in planning from Tripmate, despite a meeting and ongoing communication with the Generali agent. Mrs. Williams further attested that the Norwegian and U.S. physicians agreed to the mode of travel due to Mr. Williams's condition. Finally, Mrs. Williams explained that Tripmate's failure to respond continued once Plaintiffs returned to the United States.

Steve Williams's affidavit explained that he was asked to review Mr. Williams's medical case in March of 2020. Steve Williams explained the considerations taken into account in determining modes of medical transport. In this case, two modes of travel were considered, including commercial medical escort, but ultimately Mr. Williams's condition necessitated private transport. The affidavit

---

[2] Plaintiffs filed a motion with the trial court to replace the policy attached to Judith Williams's affidavit after realizing the wrong policy number was attached.

[3] The original request had five requests for admissions. Defendants' responses attached to Plaintiffs' motion included two pages: the first page with requests to responses one through three, and page three, the signatory page. "

set forth the problems Mr. Williams would have encountered had he flown commercial, especially during the COVID-19 pandemic.

Defendants opposed the motion and attached Defendant's Responses to Plaintiffs' Requests for Admissions as an exhibit in support of their opposition.[4] Therein, Defendants asserted that there are genuine issues of material fact regarding the extent of coverage and that discovery is not complete. Defendants alleged that Plaintiffs failed to obtain and submit Tripmate's Program Medical Advisor and/or the local attending physician's approval for the transport and, instead of obtaining permission, Mrs. Williams independently arranged transport by REVA. In their facts, Defendants assert these independent arrangements were made while efforts were being made by Tripmate to transport Mr. Williams according to the travel insurance provisions and pending approval from his physician. Therefore, after reviewing the claim submitted by Plaintiffs, including the severity of Mr. Williams's condition, Defendants determined reimbursement for "non-medical or registered nurse escort, and ground transportation" was warranted. Furthermore, Defendants argued that the travel insurance plan is not a health and accident policy subject to La.R.S. 22:1821.[5]

Thereafter, a hearing was held on October 11, 2021. After argument, the trial court granted summary judgment, stating:

---

[4] This document includes a page "2" with responses to requests four and five. This page was not included in the exhibit attached to Plaintiffs' summary judgment motion.

We also note that Defendants' exhibit was not properly offered into evidence at the trial court. The minutes indicate that the entire record was submitted; however, the transcript indicates that only Plaintiffs requested that evidence be admitted. The transcript lists only "Motion for Summary Judgment, Reply, and Attached Affidavits and Exhibits Filed by Judith Williams, Plaintiff."

[5] Plaintiffs replied and included an additional exhibit, checks issued by Defendants. However, this court notes that exhibits attached to a reply violates La.Code Civ.P. art. 966(B)(3): "No additional documents may be filed with the reply memorandum."

The Court reviewed the document. Clearly there was coverage. The issue is whether or not the amount of the damages, the payment. And the policy required them to provide notice, and the law requires you all to respond within time limits. The, the 22 - - Revised Statute 22:1821 gives you two days in emergency situations, and then you have the thirty days to resolve the matter.

Like she stated, at this point, it's been a year and a half since this happened. I don't know if how much more evidence and how much more information. The affidavits clearly in her, um, attached to her Motion establish that there was an emergency; there was notice. You all don't dispute coverage.

So the Court grants the Motion for Summary Judgment.

Thereafter, on December 13, 2021, the trial court granted Defendants' Petition for Suspensive Appeal. On January 6, 2022, the court granted Plaintiffs' motion to dismiss the suspensive appeal and converted the suspensive appeal to a devolutive appeal. Defendants now assert two Assignments of Error:

1. The District Court: (a) improperly decided several material questions of fact and (b) based its decision on facts not in evidence when it wrongly granted Plaintiffs' *Motion for Summary Judgment*.

2. The District Court erred in determining that: (a) as a matter of law La.R.S. 22:1821 applies to the insurance policy at issue, as that policy was a travel insurance policy rather than a health and accident policy, and (b) that Defendants were arbitrary and capricious in their refusal to reimburse Plaintiffs the cost of private air transportation back to Louisiana.

On appeal, Plaintiffs have also filed an untimely answer to appeal seeking judicial interest from the date of the violation, which Plaintiffs allege is thirty days after the claim was submitted, increased attorney fees ($25,000 or other reasonable sum to include appellate work), and court costs. The motion was referred to this court on the merits to be decided with the remainder of this case.

**DEFENDANTS' ASSIGNMENTS OF ERROR:**

On appeal, the grant of summary judgment is reviewed de novo using the same criteria as the trial court in determining the appropriateness of summary judgment.

*Duncan v. U.S.A.A. Ins. Co.*, 06-363 (La. 11/29/06), 950 So.2d 544. Thus, this court considers "whether there is a genuine issue of material fact and whether the mover is entitled to judgment as a matter of law." *Carpenter on behalf of Walters v. State Farm Mut. Auto. Ins. Co.*, 17-552, p. 2 (La.App. 3 Cir. 12/28/17), 235 So. 3d 1187, 1188. The motion "shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law." La.Code Civ.P. art. 966(A)(3). A "material fact" is one that "potentially ensures or precludes recovery, affects a litigant's ultimate success or determines the outcome of the legal dispute." *Larson v. XYZ Ins. Co.*, 16-745, p. 6 (La. 5/3/17), 226 So.3d 412, 416. "The burden of proof rests with the mover[,]" but "if the mover will not bear the burden of proof at trial on the issue that is before the court . . . the mover's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action or defense[.]" La.Code Civ.P. art. 966 (D)(1).

> Once the motion for summary judgment has been properly supported by the moving party, and the mover has made a *prima facie* showing that the motion for summary judgment should be granted, the burden shifts to the non-moving party to produce factual support . . . sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial - the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law.

*Kelley v. Estate of Kelley*, 21-178, p. 5 (La.App. 1 Cir. 10/4/21), 330 So.3d 667, 670-71.

In this case, Plaintiffs filed for summary judgment on the issue of liability and penalties. Plaintiffs have the burden of proving that their loss is covered by the insurance policy. *Rafflee v. Hurricane Sports, Inc.*, 09-349 (La.App. 3 Cir. 10/7/09), 20 So.3d 1202, *writ denied*, 09-2421 (La. 1/29/10), 25 So.3d 834.

"Whether an insurance policy provides or precludes coverage is a dispute that can be properly resolved within the framework of a motion for summary judgment." *Williams v. Univ. of La. Lafayette*, 19-753, p. 3 (La.App. 3 Cir. 4/22/20 ), 297 So.3d 1045, 1048, *writ denied*, 20-1008 (La. 11/4/20), 303 So.3d 641. In *Calderon v. Sanabria*, 21-579, pp. 4-5 (La.App. 5 Cir. 5/4/22), __ So.3d __, the court has recently explained:

> An insurance policy is a contract between the parties and should be construed using the general rules of interpretation of contracts. *Sims v. Mulhearn Funeral Home, Inc*., 07-54 (La. 5/22/07), 956 So.2d 583, 589. The responsibility of the judiciary in interpreting insurance contracts is to determine the parties' common intent. *Id*.; La. C.C. art. 2045. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art. 2046. Words and phrases in an insurance policy are to be construed using their plain, ordinary, and generally prevailing meaning, unless the words have acquired a technical meaning. *Geovera Specialty Ins. Co. v. Hernandez*, 18-330 (La. App. 5 Cir. 12/19/18), 262 So.3d 463, 467; La. C.C. art. 2047. Therefore, if the policy wording at issue is clear and expresses the intent of the parties, the agreement must be enforced as written. *LeBlanc v. Aysenne*, 05-297 (La. 1/19/06), 921 So.2d 85, 89.
>
> The words of a contract must be given their generally prevailing meaning. La. C.C. art. 2047. Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract. La. C.C. art. 2048. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. C.C. art. 2050.

Furthermore, "[u]nless a policy conflicts with statutory provisions or public policy, it may limit an insurer's liability and impose and enforce reasonable conditions upon the policy obligations the insurer contractually assumes." *Bonin v. Westport Ins. Corp.*, 05-886, p. 5 (La. 5/17/06), 930 So.2d 906, 911.

In their brief, Defendants assert that there remain several genuine issues of material fact regarding whether Plaintiffs proved that their loss came within the policy coverage. Defendants argue that Plaintiffs failed to provide evidence that the

requirements to trigger coverage set forth in the policy were met. Specifically, Defendants claim Plaintiffs failed to include written approval for private air transportation by both the Program Medical Advisor and the Legally Qualified Physician per the policy requirements. Additionally, Defendants aver Plaintiffs failed to show the private air transportation was arranged by the Program Medical Advisor, another requirement to coverage stated in the policy. Thus, according to Defendants, Plaintiffs failed to establish coverage and, therefore, failed to prove they were entitled to summary judgment on liability.

Additionally, and alternatively, Defendants contend that the insurance policy is not a health and accident policy; thus, La.R.S. 22:1821 and the penalties set forth therein, do not apply. However, even if the statute does apply, Defendants argue any delay and refusal to pay benefits was not arbitrary and capricious based on the failure of Plaintiffs to comply with the policy requirements necessary for coverage.

In opposition, Plaintiffs argue that this policy is a "health and accident" policy according to Louisiana's insurance code and that those code articles pertaining to "health and accident," particularly La.R.S. 22:1821, govern this case. Plaintiffs aver they had no correspondence from Tripmate throughout the medical event, and that according to La.R.S. 22:1821, because Tripmate failed to respond to the emergency within two days, Tripmate's silence and inaction was an unreasonable denial and Plaintiffs were justified in making their own arrangements under the emergency circumstances. While Plaintiffs do not specifically contest that they failed to get written approval from the Legally Qualified Physician per the policy requirements, Mrs. Williams stated in her affidavit that Mr. Williams's Norwegian and U.S. physicians, as well as REVA, agreed that private medical transport was necessary. Plaintiffs assert in brief that "[Defendants] cannot create issues of material fact by

9

relying on its own failure to perform. . . . Getting these approvals were internal organization functions and not within the reach of [Plaintiffs]." Furthermore, "pre-approvals are inappreciable in an emergency and unenforceable" citing La.R.S. 22:1821(D)(2)(a).[6] Thus, Plaintiffs' main argument is that their claims were "health and accident" governed by La.R.S. 22:1821 and, because of the emergency nature of Mr. Williams's condition, they were not required to obtain pre-approvals from the Medical Advisor. Therefore, any failure on their part to comply with this portion of the policy is not a material issue of fact preventing summary judgment.

Accordingly, we will determine whether La.R.S. 22:1821 applies and governs this case. Louisiana's Insurance Code provides for a multitude of insurance types. Defendants assert the policy involved is a travel protection policy. The types of insurance potentially applicable to Defendants' argument are defined under La.R.S. 22:47(13) Marine and transportation, subsection (g): "Insurance against financial loss due to trip cancellation or interruption, lost or damaged baggage, trip or baggage delay, missed connections, or changes in itinerary[,]"; La.R.S. 22:47(14) "Miscellaneous. Any other kind of loss, damage, or liability properly the subject of insurance and not within any other kind or kinds of insurance as defined in this Section, if such insurance is not contrary to law or public policy"; and, as asserted by Plaintiffs, La.R.S. 22:47(2), "Health and accident":

> (a)   Insurance of human beings against bodily injury, disablement, or death by accident or accidental means, or the expense thereof, or against disablement, or expense resulting from sickness or old age, including insurance wherein the benefits are covered at a higher level when health care is received from a defined network of health care providers, provided, however, that such insurance meets all

---

[6] Louisiana Revised Statutes 22:1821(D)(2)(a) states: "Any insurer, health maintenance organization, preferred provider organization, or other managed care organization requirement that the insured be prospectively evaluated through a pre-hospital admission certification, pre-inpatient service eligibility program, or any similar pre-utilization review or screening procedure shall be inapplicable to an emergency medical condition."

applicable requirements of Subpart I of Part I of Chapter 2 of this Title, R.S. 22:241 et seq., for provision of coverage through designated providers of medical services.

(b)  Health stop loss. Insurance against major expenses incurred by an employee benefit plan due to the illness or injury of a covered employee or against major expenses incurred by a health care provider at financial risk for provision of health care to persons under an agreement.

(c)  Limited benefit. Health and accident insurance policy designed, advertised, and marketed to supplement major medical insurance that includes accident-only, the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS), dental, disability income, fixed indemnity, long-term care, Medicare supplement, specified disease, vision, and any other health and accident insurance, other than basic hospital expense, basic medical-surgical expense, or other major medical insurance.

In determining whether a policy falls under the confines of "health and accident" in Louisiana's Insurance Code, Plaintiffs point to *Rudloff v. Louisiana Health Services and Indemnity Co.*, 385 So.2d 767 (La.1979) (on rehearing), for guidance.  In that case, the supreme court determined that a policy providing hospital and medical benefits was a health and accident policy.

The plaintiff in *Rudloff* filed a suit for reimbursement of hospital and doctor's charges incurred when she was admitted for a mental or nervous disorder.  She argued that her insurer, Blue Cross, was "required by LSA-R.S. 22:213.2 to offer optional insurance coverage for the treatment of mental and/or nervous disorders" despite the group agreement specifically excluding such coverage.  *Id*. at 769-70.  The court considered whether the plaintiff's hospitalization policy was a "health and accident" insurance policy, which would require coverage for the treatment of mental and/or nervous disorders to be offered.  At the time, health and accident insurance was defined as "Insurance against bodily injury, disablement or death by

11

accident and against disablement resulting from sickness and every insurance appertaining thereto." *Id*. at 770. On rehearing, the court found:

> In *Tabb* [*v. Louisiana Health Services & Indemnity Co.*, 361 So.2d 862 (La.1978)], a policy which provided benefits for hospital and medical care, was held not to be a health and accident policy because it did not insure against injury, disablement or death. However, under the statute "health and accident insurance" also encompasses "insurance against bodily injury . . . and against disablement resulting from sickness and every insurance appertaining thereto." The United States Supreme Court has held that health insurance is "an undertaking by one person for reasons satisfactory to him to indemnify another for losses caused by illness." *Haynes v. United States*, 353 U.S. 81, 83, 77 S.Ct. 649, 650, 1 L.Ed.2d 671, 673 (1957). This policy which provides benefits for hospital and medical care, was intended to indemnify plaintiff for those expenses occasioned by her "sickness" and is therefore a health insurance policy. See Meyer, *Life and Health Insurance Law*, 19:3, p. 614 (1972). Since hospitalization policies are included within the definition of health and accident policies in Louisiana law, Blue Cross was required by LSA-R.S. 22:213.2 to offer coverage for mental disorders to its policyholders. To the extent that it conflicts with this holding, *Tabb v. La. Health Services & Indem. Co.*, 361 So.2d 862 (La., 1978) is overruled.

*Id*.

Here, the policy provides coverage for medical expenses and emergency assistance along with several other coverages. The Benefit Summary regarding medical states: "May provide Medical Expense benefits for a covered Sickness or covered Injury incurred while on Your Trip. Under certain circumstances detailed in the Plan, the Plan can pay for the transportation expenses incurred to evacuate You to the nearest qualified hospital and/or to return You home."

The policy describes the coverage in more detail as follows:

**ACCIDENT & SICKNESS MEDICAL EXPENSE:**

> Benefits will be paid for the Covered Expense incurred, up to the Maximum Benefit Amount shown in the Schedule of Benefits, as a result of a covered Injury or covered Sickness, which first occurs during Your Trip. Only Covered Expenses incurred during Your Trip will be reimbursed. Expenses incurred after Your Trip are not covered.

12

. . . .

Benefits will not be paid in excess of the Usual and Customary Charges.

Advance payment will be made to a Hospital, up to the Maximum Benefit Amount, if needed to secure Your admission to a Hospital, because of a covered Injury or covered Sickness. The Program Medical Advisor will coordinate advance payment to the Hospital.

For the purpose of this benefit:

**"Covered Expense"** means expense incurred only for the following:

1.    The medical services, prescription drugs and therapeutic services ordered or prescribed by a Legally Qualified Physician as Medically Necessary for treatment;

2.    Hospital or ambulatory medical-surgical center services (including expenses for a cruise ship cabin or hotel room, not already included in the cost of the [sic] Your Trip, if recommended as a substitute for a hospital room for recovery from a covered Injury or covered Sickness);

3.    Transportation furnished by a professional ambulance company to and/or from a Hospital.

The policy further states:

**EMERGENCY MEDICAL EVACUATION, MEDICAL REPATRIATION AND RETURN OF REMAINS.**

When you suffer loss of life for any reason or incur a Sickness or Injury during the course of Your Trip, the following benefits are payable, up to the Maximum Benefit Amount shown in the Schedule of Benefits.

1.    **Emergency Medical Evacuation:** If the local attending Legally Qualified Physician and the Program Medical Advisor determine that transportation to a Hospital or medical facility is Medically Necessary to treat an unforeseen Sickness or Injury which is acute or life threatening and adequate Medical Treatment is not available in the immediate area, the Transportation Expense incurred will be paid for the Usual and Customary Charges for transportation to the closest Hospital or medical facility capable of providing that treatment.

13

. . . .

2.    **Medical Repatriation:** If the local attending Legally Qualified Physician and the Program Medical Advisor determine that it is Medically Necessary for You to return to Your primary place of residence because of an unforeseen Sickness or Injury which is acute or life-threatening, the Transportation Expense incurred will be paid for Your return to Your primary place of residence or to a Hospital or medical facility closest to Your primary place of residence capable of providing continued treatment via one of the following methods of transportation, as approved, in writing, by the Program Medical Advisor:

i.    one-way Economy Transportation;

ii.    commercial air upgrade (to Business or First Class), based on Your condition as recommended by the local attending Legally Qualified Physician and verified in writing and considered necessary by the Program Medical Advisor; or

iii.    other covered land or air transportation including, but not limited to, commercial stretcher, medical escort, or the Usual and Customary Charges for air ambulance, provided such transportation has been pre-approved and arranged by the Program Medical Advisor. Transportation must be via the most direct and economical route.

. . . .

**Dispatch of a Physician**: If the local attending Legally Qualified Physician and the Program Medical Advisor cannot adequately assess Your need for Medical Evacuation or Transportation, and a Physician is dispatched by the Program Medical Advisor to make such assessment, benefits will be paid for the travel expenses incurred and medical services provided by the dispatched physician.

The following terms are also defined by the policy:

**"Legally Qualified Physician"** means a physician: (a) other than You, a Traveling Companion or a Family Member; (b) practicing within the scope of his or her license; and (c) recognized as a physician in the place where the services are rendered.

**"Medically Necessary"** means a service which is appropriate and consistent with the treatment of the condition in accordance with accepted standards of community practice.

**"Program Medical Advisor"** means Generali Global Assistance.

14

Lastly, the policy included a Louisiana Amendatory Endorsement which amended Section V of the policy pertaining to subrogation, concealment and misrepresentation, legal actions, and time of payment of claims. The latter was amended to state: "We, or Our designated representative, will pay the claim within 30 days after receipt of acceptable proof of loss."

The amount of coverage is also significant. For Medical Expense/Emergency Assistance, the policy provides up to $100,000 in benefits for "Accident & Sickness Medical Expense" and up to $250,000 in benefits for "Emergency Medical Evacuation, Medical Repatriation & Return of Remains."

Additionally, Mrs. Williams explained in her affidavit Plaintiffs' reason for purchasing the insurance policy at issue:

4. When we were preparing for a vacation, I purchased insurance through Viking River Cruises, as part of the entire cruise package. . . . The sales person John Faenza, described the policy and suggested that we would get a preferential rate if the premium was paid at the same time as the rest of the cruise package. Viking caters to retirees, and seniors. These are destinations designed to interest mature travelers[.] Any trip of this duration will prompt some concern for any senior traveler, and Mr. Faenza assured me that this insurance was comprehensive to cover any medical condition that could arise, or aggravation of a preexisting condition. I further purchased this policy in reliance upon this conversation and after reading the policy he provided.

. . . .

6. I called John Faenza the following day after I had a chance to read the policy. It states clearly that it provides coverage for travel delay and Interruption, for medical expense arising from illness or injury, for transportation expenses incurred to evacuate you to the nearest qualified hospital and/or return home. Medical expenses are covered to a maximum of $100,000 and emergency evacuation and repatriation is covered to a maximum of $250,000. The policy was underwritten by United States Fire Insurance.

I reviewed these points with Mr. Faenza and he agreed. I determined that the policy was worth the high premium for the assurance that we would have a safe trip and safe return.

15

After reviewing the policy, La.R.S. 22:47(2), and *Rudloff*, we find that the policy provides significant coverage "against bodily injury, disablement, or death by accident or accidental means, or the expense thereof, or against disablement, or expense resulting from sickness[.]" La.R.S. 22:47(2). Specifically, the policy will pay benefits "as a result of a covered Injury or covered Sickness" and will cover the "return to Your primary place of residence because of an unforeseen Sickness or Injury which is acute or life-threatening[.]" Thus, we agree with the trial court that this claim and policy falls within "health and accident" insurance.

Now that we have determined those provisions relating to health and accident policies apply, we must determine whether Defendants violated La.R.S. 22:1821, which states in pertinent part:

> A. All claims arising under the terms of health and accident contracts issued in this state, except as provided in Subsection B of this Section, shall be paid not more than thirty days from the date upon which written notice and proof of claim, in the form required by the terms of the policy, are furnished to the insurer unless just and reasonable grounds, such as would put a reasonable and prudent businessman on his guard, exist. . . . Failure to comply with the provisions of this Section shall subject the insurer to a penalty payable to the insured of double the amount of the health and accident benefits due under the terms of the policy or contract during the period of delay, together with attorney fees to be determined by the court. . . .
>
> . . . .
>
> D. (1) In any event where the contract between an insurer or self-insurer and the insured is issued or delivered in this state and contains a provision that **in non-emergency cases** the insured is required to be prospectively evaluated through a pre-hospital admission certification, pre-inpatient service eligibility program, or any similar pre-utilization review or screening procedure prior to the delivery of contemplated hospitalization, inpatient or outpatient health care, or medical services which are prescribed or ordered by a duly licensed health care provider who possesses admitting and clinical staff privileges at an acute care

16

health care facility or ambulatory surgical care facility, the insurer, self-insurer, third-party administrator, or independent contractor shall be held liable in damages to the insured only for damages incurred or resulting from unreasonable delay, reduction, or denial of the proposed medically necessary services or care according to the information received from the health care provider at the time of the request for a prospective evaluation or review by the duly licensed health care provider, as provided in the contract; such damages shall be limited solely to the physical injuries which are the direct and proximate cause of the unreasonable delay, reduction, or denial as further defined in this Subsection together with reasonable attorney fees and court costs.

(2)(a) Any insurer, health maintenance organization, preferred provider organization, or other managed care organization requirement that the insured be prospectively evaluated through a pre-hospital admission certification, pre-inpatient service eligibility program, **or any similar pre-utilization review or screening procedure** *shall be inapplicable to an emergency medical condition*.

(b) **Every insurer,** health maintenance organization, preferred provider organization, or other managed care organization **which includes emergency medical services as part of its policy or contract, shall provide coverage and shall subsequently pay providers for emergency medical services provided to an insured**, enrollee, or patient **who presents himself with an emergency medical condition.** This Subparagraph shall not be construed to require coverage for illnesses, conditions, diseases, equipment, supplies, or procedures or treatments which are not otherwise covered under the terms of the insured's policy or contract. The provisions of this Subparagraph shall not apply to hospital indemnity, disability, or renewable limited benefit supplemental health insurance policies authorized to be issued in this state.

(c) An insurer, health maintenance organization, preferred provider organization, or other managed care organization shall not retrospectively deny or reduce payments to providers for emergency medical services of an insured, enrollee, or patient even if it is determined that the emergency medical condition, initially presented is later identified through screening not to be an actual emergency, except in the following cases:

. . . .

(iii) Cases in which the insured does not meet the emergency medical condition definition, unless the insured has been referred to the

17

emergency department by the insured's primary care physician or other agent acting on behalf of the insurer.

. . . .

(e) Failure to comply with the provisions of Subparagraphs (a), (b), and (c) of this Paragraph shall subject the insurer, health maintenance organization, preferred provider organization, or other managed care organization to penalties as provided for in Subsection A of this Section and to penalties for violations as provided in R.S. 22:1969.

. . . .

(g) As used in this Paragraph, the following definitions shall apply:

**(i) "Emergency medical condition" is a medical condition of recent onset and severity, including severe pain, that would lead a prudent layperson, acting reasonably and possessing an average knowledge of health and medicine, to believe that the absence of immediate medical attention could reasonably be expected to result in:**

. . . .

(bb) Serious impairment to bodily function.

(cc) Serious dysfunction of any bodily organ or part.

(ii) "Emergency medical services" are those medical services necessary to screen, evaluate, and stabilize an emergency medical condition.

. . . .

(3)(a) For the purposes of this Subsection, a period of two working days from the time of the duly licensed health care provider's request to the insurer, self-insurer, third party administrator, or independent contractor for a pre-hospital admission or pre-inpatient service eligibility certification or any similar pre-utilization review or screening procedure confirmation until the receipt by the duly licensed health care provider of such insurer's, self-insurer's, third party administrator's, or independent contractor's certification, approval, or denial of the contemplated hospitalization, inpatient or outpatient health care, or medical services, shall not be considered unreasonable.

18

(b) For the purposes of this Subsection, a period in excess of two working days from the time of the duly licensed health care provider's request to the insurer, self-insurer, third party administrator, or independent contractor for a pre-hospital admission or pre-inpatient service eligibility certification or any similar pre-utilization review or screening procedure confirmation until the receipt by the duly licensed health care provider of such insurer's, self-insurer's, third party administrator's, or independent contractor's certification, approval, or denial of the contemplated hospitalization, inpatient or outpatient health care, or medical services may be considered unreasonable depending on the circumstances of each individual case.

. . . .

(d) For the purposes of this Subsection, an "unreasonable denial" shall mean the failure to do any of the following:

(i) Review a request from a duly licensed health care provider by the insurer's or self-insurer's review or screening procedure.

(ii) Review a request from the insured within the time period as provided for in the contract between the insurer or self-insurer and the insured, which time period shall not exceed two work days as provided for in Subparagraph (a) of this Paragraph.

(iii) Deliver the contracted for health care or medical services previously certified or approved by the insurer's or self-insurer's review or screening procedure for medically necessary treatment or care as mandated by and provided for in the contract between the insurer or self-insurer and the insured.

. . . .

(e) For the purposes of this Subsection, "medically necessary treatment or care" shall mean contemplated hospitalization, inpatient or outpatient health care, or medical services recommended for appropriate treatment or care in accordance with nationally accepted current medical criteria.

Plaintiffs submitted evidence explaining Mr. Williams's condition, the state of the hospital and hospital facilities, and the state of travel at the time of Mr. Williams's event during Covid-19. In the 1980s and early 1990s, Mrs. Williams was a registered nurse who spent time in the cardiac critical care department whereas Mr.

Williams practiced cardiac surgery and was still working at the time of this trip. Mrs. Williams's affidavit explains her husband was first isolated and tested for Covid-19 instead of receiving treatment for the underlying emergency, and he was instructed to take his own nitroglycerine for his symptoms. Mrs. Williams explained that her husband was first diagnosed with pneumonia and it was several days until his symptoms were realized to be largely cardiac. She continued: "His nurses informed me that his blood pressure would drop when he walked from the bed to the bathroom. He was taking nitroglycerine for the perpetual chest pain on exertion. This hospital did not have the facilities we have in the US." Mrs. Williams explained her understanding that Mr. Williams was in "acute congestive heart failure with angina and that transport was only safe or reasonable by air ambulance with oxygen support and nursing monitoring."

Mrs. Williams's understanding regarding best travel is supported by Steve Williams with REVA. Steve Williams has many years of experience in flying air ambulance and commercial medical escorts. He has "been a flight nurse since 1992" and has "a detailed understanding of the differences between the two modalities [air ambulance and commercial medical escort] of patient transport." Steve Williams explains that Mr. Williams's condition was seriously considered:

> 2.      In early March I was asked to review the medical case of an 80 year old US citizen who was hospitalized with pneumonia in Bergen Norway. . . .
>
> . . . .
>
> 4.      . . . the patient was quite unwell and had not been out of bed. On the occasions he had got out of bed he was dizzy with an unsteady gait and demonstrated orthostatic hypotension. The patient was elderly with a significant past medical history of cardiovascular diseases, past acute myocardial infarction and coronary artery bypass grafting.

The sudden onset of his shortness of breath at night also raised the possibility that as well as the pneumonia, he also had an element of congestive heart failure.

6. Additionally, there was no direct flights from Bergen to a hospital close to the patient's home, and with, at the time, the new Covid-19 travel restrictions, there were real concerns about being able to complete the journey.

7. The commercial itineraries we considered all had at least 4 segments, meaning multiple take offs and landings putting additional strain on his cardiovascular system. If he had either hypotension or an episode of congestive heart failure, these would all be more difficult to manage on a commercial aircraft with very limited options for clinical intervention.

8. An additional important factor was the significant risk of Covid 19 infection during what would be an extended commercial aircraft flight itinerary with multiple changes of planes in terminal buildings.

9. With the patient in the frail condition that was described to us at the time, an additional disease burden of infection with Covid-19 would have probably been fatal.

Further, the policy anticipates a scenario in which air ambulance is necessary to repatriate an insured and provides coverage for the type of care and travel Mr. Williams received: "other covered land or air transportation including, but not limited to, commercial stretcher, medical escort, or the Usual and Customary Charges for air ambulance[.]" Considering the foregoing and in view of the definition of "Emergency medical condition" set forth in La.R.S. 22:1821, which is based on a "prudent layperson" understanding of the medical event,[7] we find

---

[7] Louisiana Revised Statutes 22:1821(D)(2)(g)(i) defines "Emergency medical condition" as:

[A] medical condition of recent onset and severity, including severe pain, that would lead a prudent layperson, acting reasonably and possessing an average knowledge of health and medicine, to believe that the absence of immediate medical attention could reasonably be expected to result in:

. . . .

Plaintiffs carried their burden on summary judgment. The burden then shifted to Defendants to produce factual support "through the use of proper documentary evidence" to prove the existence of a genuine issue of material fact or that Plaintiffs were not entitled to summary judgment. *Kelley*, 330 So.3d at 671. Defendants set forth no evidence to contest that this was an emergency medical condition under La.R.S. 22:1821. Accordingly, we find, as did the trial court, that summary judgment was proper.

Lastly, Defendants assert that the trial court erred in awarding penalties and attorney fees because Defendants were not arbitrary and capricious in their refusal to reimburse Plaintiffs. Defendants argue that there is a lack of evidence supporting a conclusion that Plaintiffs complied with the pre-requisites of the policy.

In reviewing awards of penalties and attorney fees, the third circuit has explained:

> An award of penalties and attorney fees under this statute serves as a punishment, and therefore must be applied with great care. "This section is penal in nature and is strictly construed. The burden is on the claimant to prove arbitrariness and capriciousness or lack of probable cause. *Batiste v. Pointe Coupee Constructors, Inc.,* 401 So.2d 1263 (La.App. 1st Cir.1981), *writ denied,* 409 So.2d 615 (La.1981)." *Marien v. Gen. Ins. Co. of Am.,* 02–545, p. 12 (La.App. 3 Cir.2002), 836 So.2d 239, 249 (quoting *Sanders v. Wysocki,* 92–1190, p. 8 (La.App. 4 Cir. 1/27/94), 631 So.2d 1330, 1335, *writ denied,* 94–506 (La.4/22/94); 637 So.2d 156), *writs denied,* 03–474 (La.5/9/03), 843 So.2d 396, 03–513 (La.5/9/03), 843 So.2d 397; *See also Robin v.* Allstate Ins. Co., 03– 1009, 03–926 (La.App. 3 Cir. 3/24/04), 870 So.2d 402, *writ denied,* 04– 1383 (La.9/24/04), 882 So.2d 1143.
>
> The determination as to whether an insurer acted arbitrarily or capriciously is a fact-based analysis, and therefore cannot be overturned by an appellate court absent a finding of manifest error, or that the trial court was clearly wrong. " 'The determination of whether an insurer's handling of a claim is arbitrary or capricious is one of fact, which

---

(bb) Serious impairment to bodily function.

(cc) Serious dysfunction of any bodily organ or part.

should not be disturbed on appeal unless it is manifestly erroneous.' " *Robin v. Allstate,* 870 So.2d at 410 (quoting *Myers v. Broussard,* 96–1634, p. 29 (La.App. 3 Cir. 5/21/97), 696 So.2d 88, 103).

The party claiming entitlement to penalties and attorney fees bears the burden of proving that the insurer had sufficient proof that payment on a claim was due as a basis for establishing that the insurer was arbitrary and capricious in denying the claim. *Reed v. State Farm Mut. Auto. Ins. Co.,*03–107 (La.10/21/03), 857 So.2d 1012.

The determination of whether the insurer acted arbitrarily or capriciously must be based, at least in part, on the information known to the insurer at the time the claim was made. If the insurer has a good faith, reasonable explanation for its failure to timely pay on a claim, then the penalty provisions should not apply. *Myers,* 696 So.2d 88. Also, when a reasonable disagreement exists between an insurer and an insured, it is not arbitrary and capricious or without probable cause on the part of the insurer to deny payment on the claim that is in dispute. *Wiley v. Safeway Ins. Co.,* 99–161 (La.App. 3 Cir. 7/14/99), 745 So.2d 636. "Whether there are such just and reasonable grounds is a question of fact. The trial court's findings of fact may not be disturbed on appeal absent manifest error." *Craig v. K & K Ins. Group, Inc.,* 00–1549, p. 3 (La.App. 3 Cir. 2/28/01), 780 So.2d 1249, 1251 (citation omitted), *writ denied,* 01–839 (La.5/11/01), 792 So.2d 738.

*Stewart v. Calcasieu Par. Sch. Bd.*, 05-1339, pp. 4-5 (La.App. 3 Cir. 5/3/06), 933 So.2d 797, 801.

Louisiana Revised Statutes 22:1821(A) provides for penalties and attorney fees when a claim is not paid within thirty days from "written notice and proof of claim, in the form required by the terms of the policy . . . unless just and reasonable grounds, such as would put a reasonable and prudent businessman on his guard, exist."

The purpose of penalties and attorney fees in La.R.S. 22:1821 has been explained by the supreme court: "The statute was evidently enacted to effect a speedy collection of just claims without diminution and without unnecessary delay and expense." *Lopez v. Blue Cross of La.*, 397 So.2d 1343, 1344-45 (1981). The first circuit expanded on the reasoning behind penalties against insurers who fail to

23

pay claims in *Crawford v. Blue Cross Blue Shield of Louisiana*, 99-2503, p. 15 (La.App. 1 Cir. 11/3/00), 770 So.2d 507, 517, *writ denied*, 00-3267 (La. 2/16/01), 786 So.2d 98:

> The imposition of an attorney's fee in addition to a penalty is a deterrent to an insurer's self-serving dalliance in the payment of a just claim. An insurer has an affirmative duty to verify, through a reasonable investigation, whether the claim was actually excluded from coverage. When, as here, an insurer chooses to resist its contractual obligation based upon a supposed defense, which a reasonable investigation would have proved to be without merit, it acts at its peril and renders itself liable for statutory penalties *and* attorney's fees. *See Savarino v. Blue Cross and Blue Shield of Louisiana Inc.*, 98–0635, p. 13 (La.App. 1 Cir. 4/1/99), 730 So.2d 1083, 1090.

In *Lopez,* the court found that the insurer's reliance on its opinion that the claimant did not submit a record that established a "recoverable claim" and that the records submitted "did not contain certain details sufficient according to company guidelines to establish the medical necessity of the hospital admission" were not "just and reasonable grounds" to deny payment. *Id.* at 1345.

In this case, the policy instructs insureds that they must report a claim within twenty days of the loss or "as soon as is reasonably possible." The claim may be made online. The policy continues, "[t]he notice should be given to Us or Our designated representative and should include sufficient information to identify You." The policy specifies:

> **Claim Forms**:    When notice of claim is received by Us or Our designated representative, forms for filing proof of loss will be furnished. If these forms are not sent within 15 days, the proof of loss requirements can be met by You sending Us a written statement of what happened. This statement must be received within the time given for filing proof of loss.

> **Proof of Loss**:    Proof of loss must be provided within 90 days after the date of the loss or as soon as is reasonably possible. Proof must, however, be furnished no later than 12 months from the time it is otherwise required, except in the absence of legal capacity.

24

Plaintiffs produced Mrs. Williams's affidavit wherein she stated that Tripmate was immediately put on notice that an emergency occurred on March 11, 2020, and in fact, Generali did respond and assist with securing Mr. Williams's lab results and accommodations for Mrs. Williams. Mrs. Williams further attested that she submitted a claim online and, after receiving no response, submitted a claim via U.S. mail on March 19, 2020. After receiving no response still, Mrs. Williams submitted a second claim via U.S. mail on May 4, 2020, and another via FedEx, which included "duplicate medical records and invoices, the same records that had already been uploaded to the claim website." The "Claim Status" document attached to Mrs. Williams's affidavit shows a Medical Sickness/Disease claim was incurred on 3/10/2020 and reported on 3/18/2020 and a "Non-emergency Medical Evacuation" claim incurred on 2/26/20 and reported on 3/18/20. Mrs. Williams's testified that Tripmate made their first payment in the amount of $965.17, on May 31, 2020, and a second payment for $16,000.00 in July of 2021.

The evidence submitted by Plaintiffs shows the claim was reported according to the policy, with documentation, and was not paid within thirty days of written notice and proof of claim. Again, we find that Plaintiffs carried their burden of proof on summary judgment and that the burden shifted to Defendants. Again, Defendants submitted no evidence in support of their position. Accordingly, considering the above facts, we find no error in the trial court's award of penalties and attorney fees in this case.

**PLAINTIFFS' ANSWER TO APPEAL:**

This court is also tasked with deciding whether Plaintiffs will be permitted to file their answer to the appeal, which was untimely filed. In their answer to appeal, Plaintiffs seek judicial interest from the date of the violation, which Plaintiffs allege

25

is thirty days after the claim was submitted, increased attorney fees of $25,000 or another reasonable sum to include appellate work, and court costs.

Plaintiffs acknowledge their answer was due February 22, 2022, but their Motion to File a Later Answer and Answer to Appeal were not filed until March 29, 2022. Their only reasoning for such a tardy filing was that counsel had "other commitments and deadlines in other cases." Defendants assert that Plaintiffs' justification that they were not put on notice and could not have prepared the answer any sooner due to other commitments does not pass muster, citing *Ballex v. Municipal Police Employees' Retirement System*, 16-905 (La.App. 1 Cir. 4/18/17), 218 So.3d 1076.

Louisiana Civil Code of Procedure Article 2133 states that a party seeking modification of a judgment "**must** file an answer to the appeal, stating the relief demanded, not later than fifteen days after the return day or the lodging of the record whichever is later." In *Ballex*, 218 So.3d 1076, the appellee was permitted to file an untimely *supplemental* answer to appeal where the original answer was timely filed, no new issues were raised, the appellant had sufficient time to address the supplemented answer, and the appellant did not object to the late filing. *Ballex* also cited *Eschete v. Gulf South Beverages*, 442 So.2d 556, 559 (La.App. 1 Cir. 1983), which similarly stated:

> [W]here an appellee timely files an answer to an appeal, later supplements that answer more than 15 days after the return date with leave of court, but raises no new issues and affords an appellant ample time within which to respond to the supplemental answer, then pursuant to the powers vested in the court by La.C.C.P. art. 2164, it is both just and efficient to consider the supplemental answer.

The answer in this case was late and was not a supplemental answer. Counsel did not provide a sufficient reason for the delay. This court has previously denied

26

requests to modify judgments when the answers to appeal were untimely. *See David v. David*, 14-657 (La.App. 3 Cir. 12/23/14), 156 So.3d 219, *writ denied*, 15-171 (La. 4/24/15), 169 So.3d 356; *Julien v. Dynamic Indus., Inc.*, 10-520 (La.App. 3 Cir. 11/3/10), 52 So.3d 174; *Bolzoni v. Theriot*, 95-1233 (La.App. 3 Cir. 3/6/96), 670 So.2d 783, *writ denied*, 96-718 (La. 4/26/96), 672 So.2d 908. Based on the foregoing, Plaintiffs' Motion to File a Later Answer and the Answer to Appeal is denied.

**DECREE:**

Considering the foregoing, we affirm the trial court's October 11, 2021 Judgment. However, Plaintiffs' Motion to File a Late Answer is denied. Costs of this appeal are assessed against Defendants, United States Fire Insurance Company and Tripmate, Inc.

**AFFIRMED.**